LAFARGE CORPORATION, Appellant,

v.

WOLFF, Incorporated, Appellee.

No. 03–97–00741–CV.

Court of Appeals of Texas,
Austin.

Sept. 24, 1998.

Jess M. Irwin, III, Herring & Irwin, L.L.P., Austin, for Appellant.

Christa Brown, Austin, for Appellee.

Before POWERS, KIDD and B.A. SMITH, JJ.

POWERS, Justice.

Wolff, Incorporated sued Lafarge Corporation for breach of contract. A jury returned a verdict in favor of Wolff awarding Wolff $1,380,000 in actual damages and $207,000 in attorney's fees. The trial court rendered judgment in favor of Wolff for $1,323,911 in actual damages, $63,000 in prejudgment interest, and $207,000 in attorney's fees for a total of $1,593,911. We will reverse the judgment and remand the cause for a new trial.

## THE CONTROVERSY

In 1980, Wolff entered into a "Clay Mining and Delivery Contract" with General Portland, Inc., Lafarge's corporate predecessor.[1] The contract required Wolff to quarry clay from property owned by Lafarge and to deliver the clay to Lafarge's cement manufacturing plant near New Braunfels. Wolff was required to provide its own equipment, materials, labor, machinery, and supplies. In addition to mining and hauling the clay, Wolff had to maintain the necessary haul roads and pump water out of the clay pits.

The contract was a requirements contract under which Lafarge was required to pay Wolff a monthly service charge equal to the *greater* of one of two calculations: either the "contract" price, or the "minimum" price. The contract price amounted to $3.59 per ton of clay mined and delivered. The minimum price amounted to $2.25 per ton plus an additional "base amount," which was reached by adding a figure from a table. This figure was based on the amount of clay delivered in the preceding month.[2] The contract also provided:

> Once the Base Amount has increased pursuant to the [included] schedule, it shall not be reduced even though the number of tons delivered to the Plant declines to a lower level.

Thus, if several months passed in which Lafarge required little clay, Wolff could count on receiving at a minimum the "base amount." At the time events giving rise to the controversy took place, the base amount

---

1. Prior to 1988, Lafarge was the holding company for General Portland. In 1988, Lafarge became the operating company and assumed all of General Portland's contractual obligations. For convenience, we will refer to both entities as Lafarge.

2. The contract included an escalation clause for both the "contract price" and the "minimum price."

had reached $20,000 per month. The contract had a term of five years.

In 1985, the five years expired. The parties renewed the contract with changes. Nelson Wolff, president of Wolff, and J.T. Hill, the plant manager at Lafarge's New Braunfels plant, negotiated the new terms. Under the new terms, Wolff was required to haul away the "by-pass dust" that was generated during the clay mining process at no extra charge and to make additional capital investments of about $375,000 for equipment and facilities at the site of the clay pit. In exchange for these added obligations, Wolff obtained from Lafarge a right to renew the contract for two additional five-year periods.[3]

Hill sent the proposed contract to Lafarge's headquarters for approval. Hill's superiors returned the document, having added the language emphasized in the following passage:

> The contractor shall have the option to further renew the contract for two (2) additional five-year periods on the same terms and conditions by giving written notice.... Notice to be given 90 days prior to the 28th day of May, 1995 to extend the contract to May 27, 2000, *provided however that nothing contained herein shall obligate owner to continue operation of owner's plant or the manufacture of cement.*

After discussion, the parties signed the contract.

In September 1994 Lafarge sold the concrete plant to Sunbelt Cement. With no advance notice to Wolff, Lafarge sent a letter to Wolff stating that Wolff's services would no longer be needed. Lafarge stated simply that it had sold the plant and was therefore "terminating" the contract pursuant to the italicized proviso above. Sunbelt hired another hauler.

Wolff thereupon found itself with no contract and idle clay-hauling equipment it had purchased to perform the Lafarge contract. Wolff gave Lafarge notice it was exercising its second option to extend the contract to the year 2000, and demanded continued payment of the monthly $20,000 "base amount." Lafarge refused to pay. This lawsuit ensued.

## DISCUSSION AND HOLDINGS

Lafarge focuses on four issues on appeal. First, Lafarge contends it did not breach the contract. Second, Lafarge contends that even if it breached the contract, Wolff suffered no damages or the damages were improperly calculated. Third, Lafarge contends the evidence was insufficient to support the award of attorney's fees. Finally, Lafarge contends the trial court erred in rendering partial summary judgment in favor of Wolff on Lafarge's counterclaim.

*Breach*

Lafarge argues in points of error six through eight that the evidence does not support a finding that it breached the contract.[4] Lafarge argues it had a right to terminate the contract unilaterally upon the sale of the plant. Lafarge relies on the contract proviso "that nothing contained herein shall obligate owner to continue operation of owner's plant or the manufacture of cement."

The trial judge found this clause to be ambiguous, and allowed the parties to testify as to their intent regarding the proviso. Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances existing when the contract was made. *National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex.1983). A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law. *CBI*, 907 S.W.2d at 520;

---

3. These renewals, if exercised, would extend the life of the contract until May 2000.

4. Lafarge's points of error are as follows: (6) As a matter of law, the trial court erred in ruling that the contractual proviso in question was ambiguous and in admitting parol evidence of intent which resulted in the rendition of an improper judgment; (7) The trial court erred in denying

Lafarge's Motion for Instructed Verdict at the Close of the Evidence because as a matter of law Lafarge did not breach the Contract; and (8) The trial court erred in denying Lafarge's Motion for Judgment Notwithstanding the Verdict because as a matter of law the evidence established that Lafarge did not breach the Contract.

*Coker*, 650 S.W.2d at 393; *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (Tex.1951). On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue regarding the parties' intent. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996); *Daniel*, 243 S.W.2d at 157; *see also generally CBI*, 907 S.W.2d at 520. If the instrument is ambiguous, the court may admit extraneous evidence to determine its true meaning. *Enochs v. Brown*, 872 S.W.2d 312, 319 (Tex. App.—Austin 1994, no writ); *Connelly v. Paul*, 731 S.W.2d 657, 660 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

The proviso clearly states that Lafarge is not obligated to continue operation of the plant; it fails, however, to state the consequences of a shut-down.[5] The obvious question is whether th ` parties intended that if Lafarge sold its plant Wolff's right to compensation would terminate.

Wolff argues it is absurd to believe Lafarge could unilaterally end all obligations to Wolff simply by selling the plant. Wolff points out that the 1985 contract renewal obligated Wolff to make significant capital expenditures in order to perform services for Lafarge and to take on additional tasks without extra compensation. In exchange for these new obligations, Wolff was given an option to renew the contract in order to recapture its capital expenditures over time. And, Wolff argues, if the proviso allowed Lafarge to terminate at will its obligations, Wolff's options to renew the contract would be illusory and worthless. Instead, Wolff contends, the clause was intended to cover the situation in which an economic downturn caused temporary cessation of production at the plant. In that event, Wolff could not complain of Lafarge's lack of clay requirements.[6]

We agree the parties' intent regarding the meaning of the clause is not clear. Each party advances a reasonable explanation; at least, each party advances an explanation as reasonable as could be expected given the wording of the proviso. We believe the trial judge correctly permitted the parties to introduce evidence regarding their intent.

Nelson Wolff testified that when he read the proviso, he did not understand it. He asked Hill, Lafarge's negotiator, what the proviso meant. Hill, equally unsure, telephoned Lafarge's headquarters and was told the proviso would allow Lafarge to cease production in the event of an economic downturn. Hill so explained the proviso to Wolff and told Wolff it would not apply unless the plant shut down for economic reasons. Wolff then signed the contract.[7] Both Wolff and Hill agreed that, as they understood the contract at the time of signing, a *sale* of the plant would *not* free Lafarge from its obligation to pay Wolff the "minimum price" for the duration of the contract.

The jury was asked to resolve the question of whether the parties intended that a sale of the plant would end Lafarge's obligations to Wolff under the contract. The jury question was as follows:

### QUESTION NO. 1

Did Wolff, Incorporated and Lafarge Corporation agree that their contract would not terminate upon sale of the plant?

It is your duty to interpret the following language of the 1985 Reformation and Addendum to the Clay Mining and Delivery Contract: "PROVIDED HOWEVER THAT NOTHING CONTAINED HEREIN SHALL OBLIGATE OWNER TO CONTINUE OPERATION OF OWNER'S PLANT OR THE MANUFACTURE OF CEMENT."

---

**5.** The contract does not state, for example, "In the event of a shut-down, Lafarge is not obligated to continue payment to Wolff."

**6.** Without such a clause, a lack of requirements might be considered a breach.

**7.** Hill testified to these same facts and opinions. Wolff and Hill disagreed only about whether Wolff would be entitled to the "minimum price" in the event the plant closed due to an economic downturn. Hill thought no; Wolff thought yes.

You must decide its meaning by determining the intent of the parties at the time of the 1985 Reformation and Addendum. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

Answer "Yes" or "No".

The jury answered, "Yes." We conclude the answer was supported by the evidence.

■ In its ninth and tenth points of error Lafarge contends the trial judge erred in refusing to submit an issue on whether Lafarge breached the contract.[8] The requested issue inquired as follows: "Did Lafarge Corporation fail to comply with the contract?" The trial judge denied the request.

■ Whether a party has breached a contract is a question of law for the judge, not a question of fact for the jury. *Garza v. Southland Corp.*, 836 S.W.2d 214, 219 (Tex. App.—Houston [14th Dist.] 1992, no writ). The judge determines what conduct is required of the parties and, insofar as a dispute exists concerning the failure of a party to perform the contract, the judge submits the disputed fact questions to the jury. *ITT Commercial Fin. Corp. v. Riehn*, 796 S.W.2d 248, 253 n. 3 (Tex.App.—Dallas 1990, no writ). Where the evidence is undisputed regarding a person's conduct under a contract, the judge alone must determine whether it shows performance or breach of his contract obligation. *Callaway v. Overholt*, 796 S.W.2d 828, 831 (Tex.App.—Austin 1990, writ denied). Submission of a "breach of contract"

issue such as requested by Lafarge improperly requires the jury to determine a question of law. *Barton v. Davis*, 441 S.W.2d 299 (Tex.Civ.App.—El Paso 1969, writ ref'd n.r.e.); *Foerster v. Peoples*, 362 S.W.2d 918 (Tex.Civ.App.—Amarillo 1962, no writ). This ultimate question of law is for the judge to decide based upon facts found by the jury. *See Fort Worth Neuropsychiatric Hosp., Inc. v. Bee Jay Corp.*, 600 S.W.2d 763 (Tex.1980).

It is undisputed that after Lafarge sold the plant it informed Wolff the contract was "terminated" and refused to make additional payments under the contract. Under the circumstances, the trial judge did not err in refusing the question and Wolff did not waive its cause of action for breach of contract. We overrule Lafarge's ninth and tenth points of error.

Given the jury's finding that the parties intended that the contract continue in effect after the sale, and the undisputed facts regarding Lafarge's actions after the sale, we conclude the evidence was sufficient to support the breach-of-contract determination. We therefore overrule Lafarge's points of error six through eight regarding breach.

*Damages*

In points of error one through five and eleven and twelve, Lafarge complains of the damages awarded to Wolff.[9]

■ Lafarge contends that as a matter of law Wolff was not damaged by the alleged breach of contract. We disagree. The evidence at trial showed that over the fourteen-year life of the contract, Wolff averaged ap-

8. Specifically, these points of error argued that: (9) Wolff waived its breach of contract cause of action by failing to request the submission of an issue to the jury concerning breach; and (10) the trial court erred in failing to submit to the jury a question inquiring whether Lafarge failed to comply with the contract.

9. These points of error state: (1) The trial court erred in denying Lafarge's Motion for Instructed Verdict at the Close of the Evidence because there was no evidence that Wolff was damaged as a result of the alleged breach of contract and, in fact, as a matter of law the evidence established that Wolff was not damaged by the alleged breach of contract; (2) The trial court erred in submitting [a question on damages] to the jury because as a matter of law there was no evidence

that Wolff was damaged by the alleged breach of contract; (3) [For the reasons stated in point of error one] the trial court erred in denying Lafarge's Motion for Judgment Notwithstanding the Verdict; (4) The evidence is legally insufficient to support the jury's answer [to the question] regarding damages; (5) The evidence is factually insufficient to support the jury's answer [to the question] regarding damages; (11) The trial court erred in submitting [the question on damages] because that question failed to correctly state the measure of damages and was fatally defective; and (12) The trial court erred in failing to submit to the jury Defendant's Proposed Instruction, which correctly stated the measure of damages.

proximately $200,000 profit per year. After Lafarge breached the contract, Wolff was not only deprived of anticipated profits for the remainder of the life of the contract but also left with an assortment of heavy machinery purchased for the purpose of performing the contract—machinery for which Wolff no longer had any use.[10] On this basis alone the trial judge could have concluded there was sufficient evidence to send to the jury a question on damages. We overrule Lafarge's points of error one, two, and three.

Lafarge argues in points of error eleven and twelve that the trial judge erred by refusing to submit to the jury Lafarge's proposed instruction on damages and by submitting instead an erroneous instruction. The trial judge submitted the following instruction regarding damages:

Consider the following element of damage, if any, and none other:

The amount of money that would have been paid to Wolff Incorporated if it had continued to receive payments due to it under the agreement, as amended.

Using this instruction, the jury concluded that Wolff would have been entitled to $1,380,000 under the contract. Lafarge argues this instruction probably caused an improper verdict.

The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. *Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991). By the operation of that rule a party generally should be awarded neither less nor more than his actual damages. *Id.; see also Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (Tex.1952) (measure of damages for breach of contract is just compensation for damages actually sustained by plaintiff as a result·of defendant's default).

To restore an injured party to the position he would have been in had the contract been performed, it must be determined what additions to the injured party's wealth have been prevented by the breach and what subtractions from his wealth have been caused by it. 5 *Corbin on Contracts* § 992 (1964); *see Mistletoe Express Serv. of Oklahoma City, Oklahoma v. Locke,* 762 S.W.2d 637, 638 (Tex.App.—Texarkana 1988, no writ). Where, as here, it is shown that the business was a going concern and making a profit when the contract was breached, such pre-existing profit, together with other facts and circumstances, may be considered in arriving at a just estimate of the amount of profit which would have been made if the defendant had not breached the contract. *See Southwest Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1099 (Tex.1938).[11]

Lafarge argues that the measure of damages submitted to the jury was improper because it required the jury to consider only Wolff's anticipated *gross receipts* under the contract, without allowing the jury to subtract from those receipts any costs Wolff might have incurred had the contract continued. Thus, argues Lafarge, the jury did not arrive at an estimate of Wolff's anticipated *profit* under the contract but rather an estimate of Wolff's total anticipated *receipts* for the duration of the contract.[12] We agree.

A party's expectation interest is measured by his anticipated receipts and losses caused by the breach *less any cost or other loss he has avoided by not having to perform.* See Restatement (Second) of Contracts § 347 (1981); *Coon v. Schoeneman,* 476 S.W.2d 439, 441 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.). The evidence showed that during the pendency of the contract, Wolff incurred costs even during months when it hauled no clay for Lafarge. The jury should have been permitted to determine Wolff's probable receipts during the

---

10. Although some of this machinery belonged to Wolff's parent company, Wolff seems to have borne some of the cost of the capital expenditures.

11. A plaintiff may, of course, forego its lost profits altogether and seek instead a right to damages based on his reliance interest. *See* Restatement

(Second) of Contracts § 349 (1981). Wolff does not argue it was seeking reliance damages under the contract.

12. Lafarge argues the jury obviously multiplied $20,000 (the "base amount") times sixty-nine, the number of months remaining on the contract, for a total of $1,380,000.

duration of the contract, based on its experience in previous years, less the costs Wolff avoided due to the breach.

 Wolff argues it was not seeking a traditional "lost profits" measure of damages, so the traditional measure does not apply. It argues it was entitled to seek payment for the money due it under the contract, because that money was due even if Wolff *never hauled another load of clay* for Lafarge. We assume Wolff is arguing there was no saved cost of performance. As stated previously, it is clear from the record that there were costs associated with Wolff's performance of the contract even during months when Lafarge's clay requirements were zero. At the very least, Lafarge was entitled to a jury instruction that allowed the jury to determine Wolff's saved cost of performance and to subtract it from Wolff's anticipated receipts under the contract.[13] This being the case, we agree that the jury charge was erroneous and sustain Lafarge's eleventh point of error.

 Of course, we may not reverse a judgment due to the erroneous jury charge unless the error probably caused the rendition of an improper judgment. *See* Tex. R.App. P. 44.1(a). Wolff argues that if there was error in the jury charge, it was harmless. Wolff argues that even if the jury simply multiplied the base amount to determine Wolff's minimum income, that number approximated in any case the *profit* Wolff would have made under the contract, rendering any error harmless as a matter of law.

It would not be proper for us to make the assumptions Wolff implies. Wolff asks us to find as a fact that its figures regarding costs and estimated future income are accurate. If Wolff seeks lost profits, whether calculated on the basis of its previous performance under the contract or by the minimum guaranteed contract price, it must secure jury findings on the relevant issues. Lafarge presented at trial an estimate of Wolff's projected profits under the contract different from the estimate presented by Wolff. Thus, we find that the improper measure of damages in the charge probably caused the rendition of an improper judgment. *Id.; see Oehlert v. Massey,* 919 S.W.2d 796, 798 (Tex. App.—Texarkana 1996, writ denied) (appellate court required to reverse judgment based on erroneous jury question regarding damages where issues of fact remained unresolved).

Because the points of error discussed are dispositive of the appeal, we refrain from discussing Lafarge's remaining points. We reverse the judgment and remand the cause to the trial court for a new trial.

---

13. Wolff in substance asks this court to consider the "base amount" due under the contract to be a provision for liquidated damages. Parties to a contract may, of course, stipulate the amount of damages to be recovered in the event of a breach. *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (Tex.1952); *Birdwell v. Ferrell,* 746 S.W.2d 338, 340 (Tex.App.—Austin 1988, no writ). The stipulated sum should represent a reasonable estimate of damages, and the intent that the sum be in lieu of other damages must be evident. *Stewart,* 245 S.W.2d at 487. Such an agreement must, however, be expressed, and in the absence of an express agreement for liquidated damages the court will not make one for the parties. *Birdwell,* 746 S.W.2d at 341; *Kellam v. Hampton,* 58 Tex.Civ.App. 484, 124 S.W. 970, 971 (Tex.Civ.App.1910, no writ). Unfortu-

nately, Wolff never alleged in the trial court that the parties intended the "base amount" to serve as a provision for liquidated damages, nor do we see any basis from which to draw such a conclusion.

Wolff's petition supports this conclusion. In its second amended original petition, Wolff asked for "its entire damages arising from the anticipatory breach of the Contract by LAFARGE, which damages include, but are not limited to, the present value of *all amounts that Plaintiff would have received under the Contract had it been performed.* Alternatively, Plaintiff is entitled to recover lost profits resulting from Defendants breach of the Contract." (emphasis added). There appears in the petition no reference to liquidated damages.