

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-08-00095-CV
_____

W. K. HICKS AND J. E. HICKS, Appellants

V.

PILGRIM POULTRY, G.P., AND PILGRIM'S PRIDE
CORPORATION, Appellees

On Appeal from the 76th Judicial District Court
Camp County, Texas
Trial Court No. CV-03-3959

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

## I.    FACTUAL AND PROCEDURAL HISTORY

J. E. Hicks and W. K. Hicks are brothers who own land adjacent to the Strube Egg Farm, owned and operated by Pilgrim Poultry, G.P., and Pilgrim's Pride Corporation (collectively "Pilgrim") in Camp County. For more than seven years, the Hickses complained about the problems attendant to having more than a million chickens next door. In 1999, after having been fined by the State commission charged with regulating these activities[1] for not having a waste permit for the facility, Pilgrim applied for a waste disposal permit. The permit application requested approval of a spray method of waste removal. The Hickses objected to the permit and requested a public hearing.

Pilgrim sought to settle matters with the Hickses, and on September 28, 2001, the Hickses and Pilgrim entered into an agreement to resolve all current issues regarding the pending application for permit 04032 ("2001 Agreement"). The 2001 Agreement provided in essence that Pilgrim would limit disposal of the chicken waste to a subsurface drip irrigation process on approximately 70 acres of land. The agreement made drip irrigation the sole means of disposal, required that it be authorized by a TCEQ permit, and required Pilgrim to file an amended application specifying this means of disposal. Pilgrim was to sample the water quality on the Hickses' property, and if the monitoring

---

[1]At the outset of the transactions, the State commission was named the Texas Natural Resources Conservation Commission. During the progress of the dispute, it was named the Texas Commission on Environmental Quality. In order to avoid confusion, we refer to this entity as the TCEQ throughout.

showed contamination, Pilgrim was to submit a corrective action plan to the TCEQ. In return, the Hickses agreed that after the TCEQ issued a draft permit based on the amended application, they would withdraw their hearing request and not file any new or additional hearing requests or objections related to the issuance of Permit No. 04032.

The drip irrigation system was installed before the issuance of the permit[2] and was determined not to be cost effective. As a result, the drip irrigation system was removed in March 2002. Pilgrim discovered another method of waste disposal referred to as the plow irrigation method and determined to use that method of waste disposal. At that point, Pilgrim and the Hickses renegotiated the 2001 Agreement, entering into a second compromise settlement agreement on August 6, 2002 ("2002 Agreement").

The 2002 Agreement provided that Pilgrim would pay the Hickses $750,000.00; pay $50,000.00 in attorney's fees; create an escrow account of $1,000,000.00 to fund corrective actions regarding odor problems; implement measures for odor control; and comply with the conditions of the 2001 Agreement, which was incorporated into the 2002 Agreement.[3]

---

[2]The amended application for permit 04032 was made in January 2002.

[3]The 2001 Agreement was incorporated into the 2002 Agreement as if fully set forth, except as expressly modified by the 2002 Agreement. The 2002 Agreement expressly modified the 2001 Agreement by the addition of two paragraphs. (Note that the TNRCC to which reference is made is now known as the TCEQ.) The first modification permitted Pilgrim to:

> land apply, through subsurface plow irrigation, process wastewater if such waste-water discharge has been authorized by TNRCC pursuant to an amended application to be filed by PILGRIM and such wastewater has been treated biologically to a sufficient level to eliminate nuisance odors. For purposes of this agreement

3

In return, the Hickses would release all claims related to the permit application, the 2001 Agreement and contingent upon certification of specified action programs, operation of the facility prior to August 6, 2002. The 2002 Agreement also required the Hickses to file a written request to withdraw from the hearing and to withdraw any hearing request filed concerning the permit and any objection made to the permit. The Hickses further agreed to not oppose the inclusion of the subsurface plow injection of treated wastewater as an authorized method of wastewater management on the 70 on-site acres at the Strube Egg Farm.

On August 6, 2002, the Hickses withdrew their TCEQ hearing request in writing.

On September 5, 2002, the TCEQ issued permit 04032 to Pilgrim, authorizing Pilgrim to utilize the drip irrigation method of wastewater disposal on 70 acres, per the application. At this

---

sufficient biological treatment shall be defined as 50 percent BOD removal or greater. PILGRIM agrees to analyze wastewater to be applied on the 70 acres at least once a week for BOD, record the results of the BOD analysis and maintain each record for at least four years from the date of making the record. Such records will be available to the HICKS for review and copying at their request. This activity is limited to discharge by a subsurface plow irrigation system on approximately 70 acres as shown in exhibits C and D of attachment 1. The rate of application shall not exceed (1) a maximum of 40,000 gallons per acre per day and; (2) 500,000 gallons per acre per year. No application shall occur when soils are saturated or frozen. No application shall occur on any land from which surface water flow would enter the property of W.K. HICKS or J.E. HICKS.

The second modification permitted Pilgrim to dispose of process waste or process wastewater by land application by using a subsurface injection plow or subsurface pasture application system similar to the injection plow, on offsite waste management units connected to Pilgrim lagoons by pipeline, provided certain conditions were complied with in the manner of such disposal.

4

time, Pilgrim was already utilizing the plow injection system of waste disposal, after having previously removed the drip irrigation system.

On October 19, 2002, Pilgrim filed a request with the TCEQ to amend the permit to change it to what is known as a registration (in lieu of a permit) to increase the number of birds at the facility by 138,715, to add 484 acres of on-site land application, to add 1,023 acres of off-site land application, to make the use of treated wastewater optional rather than mandatory, and to employ the subsurface injection plow means of waste disposal on the same 70-acre tract previously approved for the drip irrigation method. A notice of the request to amend Permit No. 04032 was published in the newspaper, and it was from this publication that the Hickses learned that it had been filed.

On June 19, 2003, the Hickses wrote a letter to the TCEQ. The letter traced the history of the dispute between the parties and advised the Commission of the 2002 Agreement. The Hickses challenged several items in the application, including the requested authorization to increase the number of birds at the facility, the optional use of wastewater treatment, additional on-site land application, the disposal of waste other than wastewater, and the conversion of the permit to a registration. The Hickses also requested a contested case hearing. Pilgrim claims this letter breached the 2002 Agreement.

On September 25, 2003, the Hickses filed a motion to overturn the TCEQ's executive director's decision to grant registration. Although the motion to overturn does include a recitation of the history of the problems between the Hickses and Pilgrim, the objection is primarily based on

5

alleged noncompliance with legal technicalities in granting the registration.[4] Pilgrim claims that the filing of this motion constitutes a breach of the 2002 agreement.

On November 22, 2003, Pilgrim filed a lawsuit for declaratory judgment, asking the court to declare that the Hickses breached the 2002 agreement.[5] The Hickses answered, denying any breach on their part; they also filed a counterclaim for declaratory judgment, asking the court to declare that Pilgrim had committed the first material breach of the 2002 Agreement through numerous different actions and asserting that Pilgrim was barred from pursuing relief from any subsequent breach.

On June 17, 2006, the Hickses wrote a letter addressed to their "neighbors." The letter references complaints from years prior to 2002 and encloses information to help monitor odors from the Strube facility. Pilgrim claims that this letter also constitutes a breach of the 2002 agreement.

The Hickses filed a motion for summary judgment based on the claim that the 2002 Agreement was unambiguous and requested the court to determine as a matter of law which party

---

[4]One of the claimed errors of the commissioner is that the registration authorized Pilgrim to dispose of waste on land management units identified in the application. The actual registration issued provides that the 451.25 acres of on-site land and the 1,023.43 acres of off-site land may be used for disposal of waste in addition to wastewater. 161.66 acres of the additional off-site acreage are included in the Hickses' watershed.

[5]The petition seeks to have the court declare that the Hickses breached the 2002 Agreement in writing the June 19, 2003, letter to the TCEQ; it does not mention the motion to overturn or a subsequent letter written by the Hickses on June 17, 2006, which Pilgrim now claims also breach the 2002 Agreement. The motion to overturn and the 2006 letter were introduced at trial without objection, and the Hickses do not claim waiver of these additional allegations of breach. We therefore consider each of the documents claimed by Pilgrim to have breached the 2002 Agreement.

breached the agreement and when any such breach occurred. The court denied the motion for summary judgment and granted the Hickses' motion in limine to exclude any parol, extrinsic, or oral evidence that contradicted the agreement.

The case was tried to a jury in Camp County over a period of four days. The trial court instructed the jury that:

> It is your duty to interpret the language of the agreement. You must decide its meaning by determining the intent of the parties at the time of the agreement. Consider all of the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

The trial court also submitted to the jury the question of whether the Hickses and/or Pilgrim failed to comply with the agreement. The jury determined that the Hickses failed to comply with the agreement and that Pilgrim did not, and returned a verdict in Pilgrim's favor for $750,000.00. The Hickses' motion for judgment notwithstanding the verdict and motion for new trial were both denied. The final judgment included the award to Pilgrim for $750,000.00 in damages for the breach of the agreement, $174,000.00 in prejudgment interest, $148,000.00 in attorney's fees and $4,322.12 in court costs, these bearing interest at 5% per annum.

## II.    ISSUES PRESENTED

On appeal, the Hickses present us with the following issues:

(1) Whether the trial court erred in delegating to the jury the role of interpreting the 2002 Agreement;

(2)  Whether the trial court erred in failing to rule as a matter of law on the issue of breach by the Hickses;

(3) Whether there is legally sufficient evidence to support the jury's answer to Question No. 1 (i.e., that the Hickses breached the settlement agreement);

(4) Whether the trial court erred in failing to rule as a matter of law on the issue of Pilgrim's alleged breach of the settlement agreement;

(5) Whether the jury's answer to Question No. 2 (i.e., asking whether Pilgrim breached the settlement agreement) is against the great weight and preponderance of the evidence;

(6) Whether the trial court erred in failing to rule as a matter of law that Pilgrim breached the settlement agreement first and that the settlement agreement was unenforceable as to the Hickses; and

(7) Whether the trial court erred in submitting an improper definition to the jury, instructing them that it was their duty to interpret the settlement agreement.

## III.    ANALYSIS

The Hickses' appellate points basically center on the issue of the trial court's decision to submit what the Hickses contend is an unambiguous contract to the jury for interpretation and in the failure of the trial court to determine the issue of breach as a matter of law.  The Hickses posit that this should have been done because (1) the contract was unambiguous and (2) the facts on which both parties rely to assert a breach of the agreement are not in dispute.  Because the question of the Hickses' breach was a question of law for the court, the trial court erred in submitting that issue to the jury.  Further, this error was not harmless because the evidence was legally insufficient to show a breach by the Hickses.  We reverse and render judgment in favor of the Hickses.

8

**A.   The Trial Court Erred in Delegating to the Jury the Role of Interpreting the 2002 Agreement**

The determination of whether a contract is ambiguous is a question of law for the court to decide by examining the contract as a whole in light of the circumstances present when the contract was entered. *Universal Health Servs. v. Renaissance Womens Group*, 121 S.W.3d 742, 746 (Tex. 2003). If contract language can be given a certain or definite meaning, then it is not ambiguous and should be interpreted by the court as a matter of law. *DeWitt County Elec. Coop. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). On the other hand, a contract is ambiguous when it is susceptible to more than one reasonable interpretation. *Frost Nat'l Bank v. L & F Distribs.*, 165 S.W.3d 310, 312 (Tex. 2005). Lack of clarity does not create an ambiguity, and "not every difference in the interpretation of a contract . . . amounts to ambiguity." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994). Whether a contract is ambiguous is a question of law, subject to de novo review. *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 705 (Tex. 2008); *Heritage Res., Inc. v. Nationsbank*, 939 S.W.2d 118, 121 (Tex. 1996).

Here, the trial court made no attempt to explicitly resolve the question of whether the contract was ambiguous. Before trial, the court granted the Hickses' motion in limine concerning the issue of the admission of extrinsic or parole evidence or statements regarding the "parties' intentions admitted so as to vary or contradict or which tend to vary or contradict the terms of the parties' contractual agreements that are the subject of this cause." Further, throughout the trial, the trial court sustained objections to attempts to interpret the contract on eight different occasions. However, the

trial court then found that the Hickses had "opened the door" and thereafter allowed testimony (to a certain extent) regarding interpretation of the agreement.

In the circumstance that a trial court fails to make the determination whether ambiguity in a contract exists, this Court may determine ambiguity as a matter of law for the first time on appeal. *Royal Maccabees Life Ins. Co. v. James*, 146 S.W.3d 340, 347 (Tex. 2004). It is also likely that the trial court, by sending the interpretation of the contract to the jury, implicitly held that the contract was ambiguous. *See Thomas v. Long*, 207 S.W.3d 334, 339–40 (Tex. 2006) (holding court of appeals was correct to consider appeal of trial court's implicit ruling). Assuming the trial court did make an implicit finding of ambiguity, on de novo review, this Court may redetermine that issue. *See Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998).

Pilgrim claims that the agreement is ambiguous and that the trial court was therefore correct in having submitted the issue of breach to the jury.[6] Pilgrim points to two separate areas of claimed ambiguity. First, Pilgrim claims that paragraph 2.4 of the 2002 Agreement is ambiguous. Paragraph 2.4 provides:

> For and in consideration of the mutual covenants recited herein, HICKS, their agents, assigns, and/or legal representatives, release and forever discharge PILGRIM, their agents, employees, officers, directors, shareholders, successor entities, subsidiaries, parent corporations, sister corporations, or related entities, and/or legal representatives of and from any claims, liabilities, damages or consequences related to the Permit application, the Settlement Agreement, and subject to the conditions set forth below, the operation of the facility prior to the signing of this Compromise and

---

[6] Interestingly, neither of the parties pled that the agreement was ambiguous, but both depend on the language of the settlement agreement for their relief.

10

Settlement Agreement. The release of liability for operation of the Facility is subject to and contingent upon PILGRIM implementing all corrective actions required by the Settlement Agreement, and HICKS receiving the report and certification for each corrective action program pursuant to Section 2.9 of this Compromise and Settlement Agreement certifying that the goal of the corrective action program as described in the Settlement Agreement has been achieved and that the environmental impacts to the HICKS property from PILGRIM'S operation have been fully addressed and corrected pursuant to all applicable environmental laws, regulations, standards and criteria of the State of Texas.

While paragraph 2.4 does not specifically state that the Hickses could not thereafter complain about events that occurred on the Strube Egg Farm prior to the signing of the 2002 Agreement, Pilgrim insists that paragraph 2.4 should be interpreted to include that prohibition. This paragraph contains general release language regularly found in settlement agreements. It does not support Pilgrim's assertion that the Hickses could never again complain about events occurring at the Strube facility before August 6, 2002. Paragraph 2.4 plainly and unambiguously states that the Hickses release all (1) claims; (2) liabilities; and (3) damages or consequences related to the permit application, the 2001 Agreement and the operation of the facility prior to signing the 2002 Agreement. A general, categorical release clause must be construed narrowly. *Boales v. Brighten Builders, Inc.*, 29 S.W.3d 159, 167 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Moreover, because this language can be given a certain and definite meaning, it is not ambiguous. *Parks*, 1 S.W.3d at 100.

Pilgrim's second area of claimed ambiguity is based on the premise that the declaratory judgment action actually involved two separate contracts. Pilgrim relies on *Progressive County*

11

*Mutual Insurance Co. v. Kelley*, 284 S.W.3d 805 (Tex. 2009), in support of this proposition. In that case, Progressive insured five vehicles for the Kelley family. Four vehicles were listed on a two-page document, and the fifth was listed on a separate two-page document. However, the two documents had separate policy numbers. *Id.* at 806. When Kelley was injured in an automobile accident, Progressive paid the policy limits. Kelley then made a claim under an alleged second policy to recover additional funds. *Id.* While the two documents had separate policy numbers, Progressive denied there was a second policy and refused to make any additional payments. The court determined that, given the existence of two documents, there was a latent ambiguity as to the intent of the parties, i.e., whether there was one or two insurance policies. *Id.* at 807.

This case can be distinguished from *Kelley* because here, the 2001 Agreement was expressly incorporated into the 2002 Agreement.[7] Although the 2002 Agreement superseded the 2001 Agreement, it specifically incorporated its terms and provisions. Thus, this case centers only on the 2002 Agreement.[8] This case is further distinguished from *Kelley* because the latent ambiguity in *Kelley* had to do with the very issue of whether there was one or two policies. The resolution of that issue was outcome-determinative. The ambiguity was identified, and the jury simply was charged

---

[7]Paragraph 2.11 of the 2002 Agreement provides: "PILGRIM agrees to comply with the terms and conditions of the September 28, 2001 Settlement Agreement, which is incorporated herein as if fully set forth, except as expressly modified by this Agreement."

[8]Counsel for Pilgrim points out that both documents were introduced at trial in support of the contention that this case involves the interpretation of two separate documents. Inasmuch as the language of the 2001 Agreement was expressly incorporated into the 2002 Agreement, this argument does not support Pilgrim's position.

to decide which interpretation was correct, in light of the parties' intent. Here, there is no such outcome-determinative factor based on the question of whether there are one or two agreements. Moreover, having relied on *Kelley* for the proposition that latent ambiguity exists in this case, Pilgrim fails to articulate what that ambiguity might be, and how it arises as a result of two separate agreements. Pilgrim simply argues that the 2001 Agreement and the 2002 Agreement were susceptible to more than one reasonable interpretation, as demonstrated by the varying interpretations testified to by the witnesses at trial.[9] Pilgrim fails to point to any specific language in the agreement about which the meaning is subject to two different, reasonable interpretations; nor does Pilgrim point to any specific trial testimony highlighting any part of the agreement alleged to be ambiguous.[10] Because the language of the agreement can be given a certain and definite meaning, it is not ambiguous. Accordingly, the trial court erred in delegating to the jury the role of interpreting the agreement. *See Parks*, 1 S.W.3d at 100.

---

[9]The witness testimony relative to the agreement is centered on (1) what the agreement said and (2) what actions were alleged to be a violation of the agreement.

[10]Even so, the parties' interpretations of the contract are not relevant if the meaning of the contract is plain from its face. *GTE Mobilnet v. Telecell Cellular*, 955 S.W.2d 286 (Tex. App.—Houston [1st Dist.] 1997, writ denied). An ambiguity does not exist simply because the parties differ in their interpretations of the contract language. *In re D. Wilson Constr. Co.*, 196 S.W.3d 774 (Tex. 2006).

**B.** **The Trial Court Erred in Failing to Rule as a Matter of Law on the Issue of Breach by the Hickses**

Having determined the agreement to be unambiguous, we turn to the issue of whether the court should have properly decided whether the Hickses' conduct amounted to a breach of the agreement. Courts have consistently held that in the event there is an unambiguous contract and there is no dispute as to the facts that may constitute a breach, it is error to submit the case to the jury. *Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex. 1971); *Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 705 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Only when there are disputed issues concerning the facts of breach should the question be submitted to a jury. *Briargrove Shopping Ctr. v. Vilar*, 647 S.W.2d 329, 333 (Tex. App.—Houston [1st Dist.] 1982, no writ). When the evidence is undisputed regarding a person's conduct under a contract, the court must determine whether such conduct amounts to a breach of that contract. *Lafarge Corp. v. Wolff*, 977 S.W.2d 181, 186 (Tex. App.—Austin 1998, pet. denied); *Meek v. Bishop*, 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (court determines what conduct is required by parties, and, insofar as a dispute exists concerning failure of a party to perform the contract, court submits disputed fact question to jury).

In the case at bar, Pilgrim claims three instances of breach by the Hickses. The conduct on the part of the Hickses claimed by Pilgrim to have amounted to breach was the drafting and mailing

14

of two letters and one legal document.[11]   There is no evidence in the record of any dispute regarding the identity of the party who drafted these documents, what the contents of the documents were, or whether the documents were, in fact, transmitted by the Hickses.  The only dispute regarding these documents was whether any of them constitute a breach of the agreement.  Other than these three documents, Pilgrim alleges no other instances of breach by the Hickses.  This is a classic illustration of the total lack of dispute as to the facts that are claimed to constitute a breach.  In such a situation, it is error to submit the issue of breach to the jury.  *Lafarge Corp.*, 977 S.W.2d at 186.  The issue of the Hickses' breach was a question for the trial court to decide as a matter of law.  *Id.*

### C.      No Evidence to Support Jury Finding of Breach by the Hickses

A trial court commits error if it submits a question of law to the jury, as was done here.  *See Knutson v. Ripson*, 163 Tex. 312, 354 S.W.2d 575, 576 (1962);  *Hudson Buick, Pontiac, GMC Truck Co. v. Gooch*, 7 S.W.3d 191, 195 (Tex. App.—Tyler 1999, pet. denied).  Absent a showing of extraneous prejudice, however, submission of a question of law to the jury is generally harmless since no harm results if the question is answered as the trial court should have answered it, or it can be deemed immaterial and disregarded by the trial court if answered incorrectly.  TEX. R. APP. P. 44.1(a)(1); *Spencer v. Eagle Star Ins. Co.*, 876 S.W.2d 154, 157 (Tex. 1994).  Extraneous prejudice exists when the answer given by the jury is incorrect as a matter of law.

---

[11]The first is a letter written to the TCEQ by the Hickses dated June 19, 2003; the second is a motion by the Hickses to overturn the TCEQ's executive director's decision to grant registration; and the third is a letter written to "neighbors" by the Hickses dated June 17, 2006.

15

The question, then, is whether the jury answered the question as the trial court would have been required to answer it. *Linden*, 222 S.W.3d at 705; *Gooch*, 7 S.W.3d at 195. This effectively requires a review of the jury's answer under a legal sufficiency or no-evidence standard. *See Universal Health Servs.*, 121 S.W.3d 742. If there is no evidence to support the jury's answer, the trial court could not have ruled as the jury did. In conducting a no-evidence or legal sufficiency review, this Court applies the traditional no-evidence standard. Evidence is legally insufficient only when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998).

Pilgrim claims the Hickses breached the agreement when they filed the motion to overturn with the TCEQ on September 25, 2003,[12] and further alleges that the Hickses relied on a litany of actions by Pilgrim that occurred before the execution of the 2002 Agreement in an effort to convince the TCEQ that Pilgrim's registration for the Strube facility should be revoked. Pilgrim points to a list of ten bulleted facts complained of in the motion, six of which occurred before August 6, 2002.

---

[12]The motion claims that the executive director of the TCEQ erred as a matter of law in granting the registration because the applicant failed to comply with the commission rules concerning certification of the application; erred as a matter of law in converting the permit to a registration; and erred as a matter of law in authorizing Pilgrim to dispose of waste on land management units identified in the application.

16

The six complaints of pre-existing matters are specifically said to be the agents of alleged breach, as they are claimed to be conduct in direct violation of the Hickses' obligations under paragraph 2.4 of the agreement.

As previously discussed, paragraph 2.4 clearly and unambiguously required the Hickses to release all claims against Pilgrim as of August 6, 2002. This release is a surrender of existing rights; it does not impose upon the Hickses an obligation to thereafter never complain of events occurring at the Strube facility prior to August 6, 2002. The parties to the agreement negotiated its terms. Both parties are sophisticated, and although the agreement could have easily included language which would have imposed upon the Hickses an obligation not to complain about past events at Strube, no such language was included. Courts are not free to rewrite agreements to insert provisions that parties could have included or to imply restraints for which they have not bargained. *Tenneco Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996).

Moreover, the Hickses were entitled under the agreement to object and seek to overturn the registration. Under paragraph 2 of the 2001 Agreement (which was incorporated into the 2002 Agreement), the Hickses specifically retained the right to file such items as the motion to overturn. The language here provides that:

> Each Protestant agrees not to file any new or additional hearing request or objection related to the issuance of a Permit based on Pilgrim's amended application proposing the wastewater management system using treatment and subsurface drip irrigation described in Attachment 1. This agreement does not, however, prevent a Protestant from 1) filing complaints to actions under the Permit 2) filing complaints to actions in violation of the Permit or 3) filing hearing requests, objections or complaints

17

related to any future application by Pilgrim for renewal, amendment, or other revision to the Permit or to any other authorization.

The third provision of this paragraph authorized the Hickses' objection to the revision of the permit. Per the 2002 Agreement, the Hickses withdrew their request for a hearing before the TCEQ on August 6, 2002, allowing Permit No. 04032 to be issued on September 5, 2002. In October 2002, Pilgrim sought to amend Permit No. 04032 and convert it to a registration. The Hickses did not object to the permit which had already been issued, but were objecting to the application for a major amendment to the permit and to the request to transform the permit into a registration.[13] Opposition to the registration and major amendment of the permit does not equate to opposition to the permit as described in the settlement agreement.

The Hickses' June 17, 2006, letter to "neighbors" is also claimed to be a violation of the agreement. This argument is based on the premise that the letter references complaints regarding the Strube facility from as early as 1999, well before the signing of the 2002 Agreement. Pilgrim further contends that this letter was an attempt to use events occurring before August 6, 2002, to influence community members to complain about the Strube facility and to create adverse consequences for Pilgrim. This is claimed to be an attempt to circumvent the 2002 Agreement by enlisting surrogates to make complaints to the TCEQ when the Hickses were contractually barred from making those complaints. The fallacy of this argument, as previously discussed, is that the

---

[13]The Hickses argue that a registration issued by the TCEQ is subject to less oversight than a certification.

Hickses were not contractually barred from making complaints to the TCEQ of the nature they filed.[14] Further, we note that the June 17, 2006, letter was sent approximately 939 days after Pilgrim filed its lawsuit. Because this letter was written well after suit was filed, it could not have formed the basis of the breach of contract claim and was not the genesis of this suit.

Pilgrim's final claim of breach is based on the June 19, 2003, letter to the TCEQ. This letter makes reference to activities that occurred at the Strube facility prior to the 2002 Agreement and as a result, is alleged by Pilgrim to violate paragraph 2.4 of the agreement. For the reasons stated above, we find no such violation, and further find that (as is the case with the motion to overturn and the 2006 letter) the Hickses were entitled to write this letter pursuant to paragraph 2 of the agreement, quoted at length herein.

## IV.    CONCLUSION

Because the jury's determination that the Hickses failed to comply with the agreement is not supported by legally sufficient evidence, it therefore cannot comport with the answer that the trial court was obligated to give. The error in submitting Question No.1 to the jury was, therefore, harmful based on the unsupported answer of the jury and the resulting judgment. Because we

---

[14]Save and except any complaints relating to "the issuance of a Permit based on Pilgrim's amended application proposing the wastewater management system using treatment and subsurface drip irrigation described in Attachment 1."

19

reverse the judgment of the trial court and render judgment in favor of the Hickses, we do not address the remaining issues, as they are moot.


Jack Carter
Justice

Date Submitted:     September 23, 2009
Date Decided:       October 20, 2009