**Opinion issued May 14, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00364-CV

————————————

**STAR ELECTRICITY, INC. D/B/A STARTEX POWER F/K/A STAR ELECTRICITY, L.L.C. D/B/A STARTEX POWER, Appellant**

**V.**

**NORTHPARK OFFICE TOWER, LP, NORTHPARK OFFICE TOWER GP, LLC, JETALL COMPANIES INC., 1415 NLW, LLC, MOHAMMED A. CHOUDHRI A/K/A ALI CHOUDHRI A/K/A ALI JETALL, THE ESTATE OF NAEEM CHOUDHRI, SHAHNAZ CHOUDHRI A/K/A SHAHNAZ AKHTER, A.I.G.W.T., INC., 5700 THOUSAND OAKS, LLC, 411 NORTH BELT, LLC, AND INNER BELT HOLDINGS, LLC, Appellees**

On Appeal from the 129th District Court
Harris County, Texas
Trial Court Case No. 2010-71330

**MEMORANDUM OPINION**

This is a suit by an electric company against its customer for breach of contract and against the customer and its associated entities for fraudulent transfer, tortious interference with a contract, dishonor of a check, fraud, and conspiracy. Appellant, Star Electricity, Inc., doing business as StarTex Power, formerly known as Star Electricity, L.L.C. ("Star"), challenges the trial court's summary judgments in favor of appellees, Northpark Office Tower, LP, Northpark Office Tower GP, LLC (collectively, "Northpark"); Jetall Companies Inc. ("Jetall"); 1415 NLW, LLC ("NLW"); Mohammed A. Choudhri, also known as Ali Choudhri and Ali Jetall ("Choudhri"); The Estate of Naeem Choudhri ("Naeem"); Shahnaz Choudhri, also known as Shahnaz Akhter ("Shahnaz"); A.I.G.W.T., Inc. ("A.I.G.W.T."); 5700 Thousand Oaks, LLC ("Thousand Oaks"); 411 North Belt, LLC ("North Belt"); and Inner Belt Holdings, LLC ("Inner Belt").

Star presents four issues. In its first and second issues, Star contends that the trial court erred by imposing a death-penalty sanction, i.e., striking the testimony of its sole expert on damages, and granting appellees' motion for no-evidence summary judgment on the damages element of Star's breach-of-contract claim. In its fourth issue, Star contends that the trial court erred in granting appellees' motion, and denying Star's motion, for summary judgment on Star's claims brought under the

2

Texas Uniform Fraudulent Transfer Act ("TUFTA").[1]  In its third issue, Star contends that the trial court erred in granting summary judgment dismissing its remaining claims as barred by the doctrine of res judicata.

We affirm in part and reverse and remand in part.

## Background

Star provides retail electricity services to commercial and residential users throughout Texas.  As a service provider, Star does not generate or transmit electricity itself, rather, it purchases electricity from a supplier and sells it to the end user.  When a customer executes a contract for electricity services, Star purchases sufficient power from its supplier to service the life of the customer's contract.  Star then delivers the electricity to the customer through distribution lines operated by transmission and distribution service providers.

Star asserts that, in September 2008, it entered into an Electric Service Agreement ("ESA") with Northpark.  Pursuant to the ESA, Star agreed to provide Northpark with electricity services at its office building located at 1415 North Loop West, Houston, (the "Property") for a term of 60 months, beginning on October 15, 2008.  Northpark agreed to purchase electricity at a rate of 8.97 cents per kilowatt hour and to pay Star monthly.  Northpark also agreed that, should it terminate or

---

[1]  *See* TEX. BUS. & COM. CODE §§ 24.001–.013.

default on the ESA prior to the end of the agreed term, it would pay Star an Early Termination Fee ("ETF"), as follows:

> In the event that Customer terminates this ESA or Customer defaults . . . then an [ETF] will be assessed. The [ETF] shall be equal to any mark to market costs. For purposes of this Agreement, the mark to market costs shall be calculated as the higher of: a) the difference between the cost of Energy procured by [Star] in order to satisfy the Customer's requirements under this ESA for the Customer's Service Location(s) . . . and the final net liquidated value of said Energy at the time of termination by Customer multiplied by the total amount of Energy procured for the Customer's Service Location(s) . . . for the remainder of the original Term of the ESA, as reasonably determined by [Star] and b) zero dollars and no cents ($0.00).

Subsequently, to fulfill its commitment under the ESA to provide electricity to Northpark, Star executed a Power Purchase and Sale Agreement ("Supplier Agreement") with its supplier, Luminant Energy Company LLC ("Luminant"). Under the Supplier Agreement, Star purchased the volume of electricity required to service the Property for the life of the 60-month ESA. Thereafter, Star began providing electricity to the Property and submitting monthly invoices to Northpark.

Two years later, in July 2010, Northpark began falling behind on its monthly payments to Star for electricity services at the Property. By October 14, 2010, Northpark's outstanding balance for electricity services totaled $82,548.39. On October 18, 2010, Choudhri, as the principal of Northpark and an officer of Jetall,[2] sent an email to Star, in which he repudiated the ESA on the ground that Star had

---

[2] Jetall's role in the ESA, if any, is unclear.

4

"never signed" it. Choudri asserted that the parties had been "operating on a month to month" basis and that he was "[t]hereby revok[ing] the agreement." Star responded that if Northpark did not retract its repudiation, it would sue to recover Northpark's outstanding balance for electricity services and for an early termination fee of $410,986.00, based on the remaining 11,265 megawatts of electricity that Star had contractually agreed to purchase from Luminant. Choudhri, on behalf of Northpark, then sent Star a letter terminating the ESA.

On October 27, 2010, Star sued Northpark for breach of the ESA, alleging that Northpark had defaulted on its terms by failing to pay for electricity services as agreed. Star sought damages in the amount of $493,534.39, consisting of $82,548.39 in unpaid services and an ETF in the amount of $410,986.00. Star also asserted liability against Choudhri and Jetall under veil-piercing theories. Star sought to enjoin Northpark from taking any action that would impair its ability to pay the judgment sought.

Star asserts that, on the same day that it filed its suit, Choudhri executed a deed transferring the Property, which was Northpark's sole asset, to NLW, another entity that Choudhri created. The transfer left Northpark depleted of assets adequate to satisfy the judgment Star sought. The following day, NLW, through Choudhri, encumbered the Property by obtaining a $6,500,000 loan against it. NLW then paid a portion of the proceeds to AIGWT, an entity owned by Choudhri and his parents,

Shahnaz and Naeem. Star asserts that proceeds further flowed to other entities that Choudhri had created, Thousand Oaks and North Belt. Accordingly, Star brought fraudulent transfer claims against all appellees. Star alleged that, in violation of TUFTA, each had fraudulently transferred assets without receiving reasonably equivalent value in exchange and with the actual intent to hinder, defraud, and delay Star, as a creditor, from recovering on its claims.

Star also brought claims against Northpark and Choudhri for dishonor of a check[3]; against Choudhri, Jetall, Shahnaz, and Naeem for tortious interference with a contract; and against all appellees for fraud and conspiracy. Star asserted that the corporate forms of Northpark, Jetall, NLW, AIGWT, Thousand Oaks, North Belt, and Inner Belt should be disregarded because Choudhri, Shahnaz, and Naeem had organized and operated them as conduits to perpetrate fraud.

*Mediation*

On May 24, 2011, the parties attended mediation before mediator, Alan Levin, and entered into a "Confidential Binding Settlement Agreement" ("Settlement Agreement"). The parties agreed that, to guarantee that Star, were it to prevail on its breach-of-contract claim against Northpark, could recover on its judgment, appellees would pledge collateral having an aggregate value in excess of $1,050,000. In partial satisfaction, Choudhri presented an 8.733-acre tract of land located on

---

[3] *See* TEX. BUS. & COM. CODE § 3.502.

6

West Fuqua Street, Houston, ("Fuqua Tract"), which he asserted had a value of $800,000. In exchange, Star agreed to non-suit its other claims without prejudice against all appellees. The Settlement Agreement states, in relevant part, as follows:

1. Land in Exhibit 1 [Fuqua Tract] placed as collateral to a[n] $800,000 payment by [illegible] party to indemnify the payment if [Star] get[s] to final judgment after appeals are exhausted. [Star] may at its expense get another appraisal and A. Levin will be non-appealable mediator to decide that this tract and any additional tracts are more than [$1,050,000].

. . . .

3. [Star] dismisses all parties but [Northpark] . . . without prejudice.

. . . .

6. If one or more disputes should arise with regard to the interpretation and/or performance of this agreement or any of its provisions, or the drafting or execution of further settlement documents, the parties agree to attempt to resolve any such dispute first by telephone conference with Alan F. Levin, mediator herein, who facilitated this settlement. If the parties cannot resolve their differences by telephone conference, then each agrees to schedule one day of mediation with Alan F. Levin, mediator herein, within thirty (30) days after the unsuccessful telephone conference to attempt to resolve the disputes. The parties shall equally share the costs of such mediation. If any party refuses to mediate, then that party hereby forfeits all right to recover attorney's fees and/or costs in any subsequent litigation brought to construe or enforce this agreement. Conversely, if the subsequent mediation is unsuccessful, then the prevailing party or parties in the subsequent litigation shall be entitled to recover, as allowed by law or contract, reasonable attorneys' fees and expenses, including the cost of the unsuccessful mediation. Alan F. Levin has the final decision on any ambiguity in the settlement agreement.

Star noted that all appellees, except Inner Belt, executed the Settlement Agreement by and through Choudhri.

7

After Star's independent appraiser concluded that the value of the Fuqua Tract was lower than appellees had represented, Levin "ordered," in Arbitrator's Order No. 2 ("Order No. 2"), that appellees pledge additional collateral, as follows:

I. [Appellees] are to produce, on or before December 31, 2011, one of the following additional collateral options:

    a. Real property having a current "As-Is" appraisal value of not less than [$464,176.00]; or

    b. Cash or a bond in an amount not less than [$214,176.00].

II. [Counsel for Star] is to promptly contact the Arbitrator, following the November 14, 2011 hearing before the Court on this matter, to provide an update of [Star's] positions regarding the following issues:

    a. Return to mediation;

    b. Whether the Settlement Agreement has been breached with regard to the alleged tardy provision of additional collateral and whether [Star] chooses to waive or pursue same; and

    c. Dismissal by [Star] of [all appellees except Northpark] without prejudice.

It is so Ordered.

On November 14, 2011, the trial court ordered that the parties return to "mediation with Alan F. Levin." After mediation, Levin issued a third order, in which he concluded, as pertinent here, that whether appellees had breached the Settlement Agreement by not timely pledging additional collateral as agreed was not within the scope of his authority. Star then non-suited without prejudice its claims against appellees, except its claim against Northpark for breach of the ESA.

8

On January 5, 2012, after appellees still had not presented additional collateral as agreed, however, Star reasserted its claims against appellees. Star also added a claim for breach of the Settlement Agreement, alleging that appellees had not timely complied as agreed, had not actually pledged any property, and that Choudhri had, since execution of the Settlement Agreement, transferred the Fuqua Tract to Inner Belt without placing equivalent value in escrow.

Eight months later, Levin concluded, in Arbitrator's Confidential, Non-Appealable Order No. 6 ("Order No 6"), that appellees had complied with both Order No. 2 and the Settlement Agreement, as follows:

> On the afternoon of Monday, August 6, 2012, . . . [appellees] hand delivered a check in the amount of [$43,796.00] to the Arbitrator in his law offices. . . . Based upon the foregoing, the Arbitrator FINDS that [appellees] have now fully complied with the collateral portion of [Order No. 2]. The tardy completion of such compliance is excused.
>
> The Arbitrator also FINDS that [appellees] have now fully complied with the portion of the [Settlement Agreement] requiring that . . . ($800,000.00) [sic] be placed as collateral "to indemnify the payment if the Plaintiffs get to final judgment after appeals are exhausted.
>
> It is, therefore, ORDERED that [appellees] have complied with both [Order No. 2] and the [Settlement Agreement] to the extent set forth above. . . .
>
> Based upon the foregoing, the Arbitrator, sitting also as the Mediator, sees no reason to declare an impasse in the mediation portion of the pending case and therefore, in light of the collateral requirement now having been fulfilled, invites the parties to consider the efficacy of further mediation toward amicable resolution of the entire pending dispute.

*Summary Judgments*

Appellees moved for a traditional summary judgment on Star's fraudulent transfer claims, asserting that Star's claims were extinguished by the statute of repose. The trial court granted summary judgment in favor of appellees, dismissing Star's claims for fraudulent transfer. Star moved for summary judgment on the merits of its fraudulent transfer claims against NLW and Choudhri. The trial court did not rule on these claims.

Appellees then moved for a traditional summary judgment on Star's claim for breach of the Settlement Agreement, asserting that such claim was barred by res judicata. Appellees asserted that Levin was acting as an arbitrator, not a mediator, and had adjudicated Star's claim for breach of the Settlement Agreement in Order No. 6, which constituted a binding arbitration order. Star argued, in its response, that the parties did not enter into an arbitration agreement, that Levin was authorized to act as a mediator, not as an arbitrator, and that his authority under the terms of the Settlement Agreement was limited to resolving ambiguities in the agreement and determining the value of the properties that appellees were to pledge as collateral. The trial court granted summary judgment in favor of appellees, "confirm[ed] the Arbitrator's Orders No. 1-6," and "dismiss[ed]" Star's remaining "causes of action"

10

against appellees,[4] "except for the claims of breach of the [ESA] against [Northpark]."

Star moved for a summary judgment on the liability portion of its claim against Northpark for breach of the ESA. Star asserted that the evidence established that there existed a valid contract between Star and Northpark, that Star performed by providing electricity to the Property, and that Northpark breached the ESA by failing to pay for electricity as agreed and by terminating the ESA before the expiration of the agreed term. The trial court granted summary judgment in favor of Star on the liability portion of its claim, leaving only the damages portion at issue.

On May 1, 2015, Star designated Madden as its expert on damages and filed his expert report. Northpark moved to compel the depositions of Madden and of Robert Verhage, Star's Director of Credit and Collections at the time of the breach. Star moved to compel the depositions of representatives of NLW and Inner Belt, with respect to its other claims.

On July 5, 2016, the trial court issued an order compelling Verhage, Madden, NLW, and Inner Belt[5] to appear for deposition within 21 days. The parties conferred and determined that the depositions could not be completed within 21 days because of scheduling conflicts. On July 20, 2016, the parties entered into a Rule 11

---

[4]     Naeem and NLW are not included in the order.

[5]     At the time, Star's other claims were still pending.

Agreement, in which they agreed that Star would produce Verhage for deposition on July 29, 2016; that NLW would produce its representative for deposition on August 1; that Star would produce Madden for deposition on August 16, 2016; and that Inner Belt would produce its representative for deposition on August 17, 2016.

On July 29, 2016, appellees deposed Verhage. On August 1, 2016, NLW presented Bradley Parker as its corporate representative for deposition. Star complained that Parker was not a competent representative of NLW because, during his deposition, he admitted that he was not an employee, owner, or contractor of NLW, and he demonstrated a lack of knowledge of any relevant information. Further, after NLW asserted frivolous objections to entire categories of questions, Star terminated the deposition. On August 12, 2016, Star filed a motion to compel a proper corporate representative of NLW and set the motion for a hearing. Star also filed a motion for protection, requesting that the trial court prohibit any further depositions until NLW complied. On September 12, 2016, the trial court denied Star's motions. Thereafter, however, the parties never completed the depositions.

On October 10, 2016, Northpark filed a motion for no-evidence and traditional summary judgments on damages, which the other appellees joined.[6] With respect to Star's claim for damages based on outstanding charges for electricity services,

---

[6]    Although all appellees joined this motion, the record reflects that Star's claim for breach of the ESA was solely against Northpark, Choudhri, and Jetall.

12

appellees asserted that there was no evidence of the amount due under the ESA because Star's "records continually produced inconsistent numbers" and Verhage's deposition testimony was inconsistent. Appellees further asserted that because Madden had failed to appear for his deposition, his expert report should be excluded, and thus there was no evidence to support Star's claim for liquidated damages, i.e., the ETF. Appellees also moved for a traditional summary judgment on their affirmative defense of accord and satisfaction, asserting that they had tendered two checks, in the amounts of $22,247.02 and $84,423.04, to Star for payment of the outstanding amount owed on Northpark's account for electricity services, which Star had not returned.

Star, in its response, requested a continuance to complete the depositions and asserted that genuine issues of material fact precluded summary judgment. Star argued that its monthly invoices constituted evidence of its damages for unpaid electricity services, and Verhage's testimony, even if inconsistent, constituted some evidence of damages. In addition, Madden's expert report constituted evidence of its liquidated damages. With respect to appellees' motion for summary judgment on their affirmative defense of accord and satisfaction, Star asserted that it had rejected appellees' checks because they had failed to tender payment for the full amount due under the ESA, including the ETF. Star attached to its response a copy of the ESA, its "Supplier Agreement" with Luminant, its monthly invoices to Northpark for

electricity services, its Amended Responses to Appellees' Requests for Disclosure, Verhage's affidavit and an excerpt of his deposition testimony, and Madden's expert report on damages. As discussed below, appellees objected, on various grounds, to the ESA, Supplier Agreement, Star's invoices, Verhage's affidavit, and Madden's expert report.

At the summary-judgment hearing on October 31, 2016, appellees argued that Madden's expert testimony should be excluded because he did not appear for his deposition and that, without his testimony, Star lacked any evidence of liquidated damages. Star argued that Madden had not yet appeared because appellees had acted in bad faith by producing a corporate representative for NLW with no relevant knowledge and who had refused to answer questions. The trial court did not rule on these matters at the hearing.

On November 7, 2016, with trial set for February 13, 2017, Star emailed appellees about completing the depositions of Madden, NLW, and Inner Belt. In a January 2, 2017 letter to the trial court, Star stated that, at a December 1, 2016 status conference, the trial court had ordered Star to produce Madden for deposition if the mediation that the parties were scheduled to attend on January 7, 2017 were unsuccessful. Star explained that the mediator had canceled due to illness and that the mediation had been tentatively rescheduled for January 9. Star asked the trial court to advise regarding its order to produce Madden for deposition. Throughout

14

the rest of January 2017, as discussed below, Star wrote letters to the trial court regarding the status of mediation, noted that Star had attempted unsuccessfully to confer with appellees regarding scheduling mediation sooner with another mediator, asked the trial court to advise regarding its order to produce Madden for deposition, and requested an emergency hearing. Star noted that it had offered to produce Madden for deposition on January 11 and 25, but appellees had declined.

On February 21, 2017, the trial court issued an order sustaining appellees' objections to Star's summary judgment evidence and excluding Madden's testimony "for failing to appear for his deposition without good cause consistent with [the] July 5, 2016 order of the court compelling his appearance and the Rule 11 agreement, dated July 20, 2016." In its order, the trial court also granted appellees' motion for traditional and no-evidence summary judgment on the damages issue and held that Star take nothing on its remaining claim against Northpark for breach of the ESA. On April 13, 2017, appellees non-suited their remaining claims, making the trial court's judgment final.

## Exclusion of Damages Expert

In its first issue, with respect to the damages element of its claim against Northpark for breach of the ESA, Star argues that the trial court erred by excluding the testimony of its sole expert on damages, Madden, after he did not appear for his deposition. Star asserts that the trial court's order constitutes a death penalty

sanction because it precluded Star from presenting evidence of its liquidated damages and resulted in the trial court granting appellees' motion for no-evidence summary judgment on damages. Star asserts that the trial court erred by not first considering lesser sanctions, noting that neither Star nor its counsel "had ever been sanctioned by the trial court in the seven-year history of the case."

***Standard of Review and Principles of Law***

We review a trial court's imposition of sanctions for an abuse of discretion. *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). A trial court abuses its discretion if it acts without reference to any guiding rules and principles or if, under all the circumstances of the particular case, the trial court's action was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

A trial court may impose sanctions against a party for failing to comply with proper discovery requests, failing to obey discovery orders, or otherwise abusing the discovery process. TEX. R. CIV. P. 215.3; *In re Ford Motor Co.*, 988 S.W.2d 714, 718 (Tex. 1998); *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991); *In re Carnival Corp.*, 193 S.W.3d 229, 234 (Tex. App.—Houston [1st Dist.] 2006, orig. proceeding). Sanctions may include, as here, prohibiting a party from introducing evidence to support certain claims or defenses. TEX. R. CIV. P. 215.2(b)(4). Courts have described such sanctions as "death penalty" or "case

16

determinative" sanctions because they have the effect of adjudicating claims, not on their merits, but based on the failure of a party or his attorney to comply with discovery requirements or court orders. *See Braden v. Downey*, 811 S.W.2d 922, 929 (Tex. 1991) (citing TEX. R. CIV. P. 215.2(b)); *TransAmerican*, 811 S.W.2d at 917–18. Sanctions that are so severe as to preclude presentation of the merits of a case should not be assessed absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules. *TransAmerican*, 811 S.W.2d at 917–18. Discovery sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless the party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit. *Id.* at 918. If a party refuses to produce material evidence, despite the imposition of lesser sanctions, the court may presume that an asserted claim or defense lacks merit and dispose of it. *Id.*; *see Braden*, 811 S.W.2d at 929 (holding severe sanctions may be necessary to prevent abusive party from thwarting administration of justice by concealing merits of case). However, because such sanctions inhibit or terminate the presentation of the merits of a party's claim, they are further limited by constitutional due process. *TransAmerican*, 811 S.W.2d at 918.

A trial court may not impose sanctions that are more severe than necessary to satisfy legitimate purposes, which include assuring compliance with discovery and deterring "those who might be tempted to abuse discovery." *Cire*, 134 S.W.3d at

17

839. Any sanction imposed must be "just." TEX. R. CIV. P. 215.2(b). In evaluating whether sanctions are just, we consider (1) whether a direct relationship exists between the offensive conduct and the sanction imposed and (2) whether the sanction ordered is excessive to punish the improper conduct. *TransAmerican*, 811 S.W.2d at 917; *see also Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex. 2003).

Under the first *TransAmerican* prong, there is a direct relationship between the offensive conduct and the sanction imposed if the sanction is directed against the abuse and toward remedying the prejudice caused to the party harmed by the conduct. 811 S.W.2d at 917; *see also Spohn Hosp.*, 104 S.W.3d at 882. The sanction "should be visited upon the offender," that is, "[t]he trial court must at least attempt to determine whether the offensive conduct is attributable to counsel only, to the party only, or to both." *TransAmerican*, 811 S.W.2d at 917. The Texas Supreme Court has explained this requirement as follows:

> This we recognize will not be an easy matter in many instances. On the one hand, a lawyer cannot shield his client from sanctions; a party must bear some responsibility for its counsel's discovery abuses when it is or should be aware of counsel's conduct and the violation of discovery rules. On the other hand, a party should not be punished for counsel's conduct in which it is not implicated apart from having entrusted to counsel its legal representation. The point is, the sanctions the trial court imposes must relate directly to the abuse found.

*Id*.

Under the second *TransAmerican* prong, the sanction imposed must not be excessive and should be no more severe than necessary to satisfy its legitimate

purposes. *Id.*; *see also Spohn*, 104 S.W.3d at 882. The record must reflect that the trial court considered the availability of appropriate lesser sanctions and must contain an explanation of the appropriateness of the sanctions imposed. *In re Carnival Corp.*, 193 S.W.3d at 237; *see Spohn Hosp.*, 104 S.W.3d at 882 (stating that trial court "must consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote compliance"). In all but the most exceptional cases, the trial court must actually test the lesser sanction. *Cire*, 134 S.W.3d at 841. Only the most egregious circumstances, such as the destruction of evidence, justifies the conclusion that no lesser sanctions would fully promote compliance with the discovery rules. *Id.* at 841–42.

## A.    *Direct Relationship*

Thus, under the first *TransAmerican* prong, the record must establish a nexus between the misconduct, the offender, and the sanction. 811 S.W.2d at 917. It must demonstrate that the sanction was directed against the abuse, imposed on the offender, and aimed at remedying the harm caused the innocent party. *Id.*

Here, the trial court states, in its order granting appellees' motion for summary judgment on damages, that it "exclude[d] the testimony of [Madden] for failing to appear for his deposition without good cause consistent with [the] July 5, 2016 order of the court compelling his appearance and the Rule 11 agreement, dated July 20, 2016." The trial court does not, in its order, discuss whether Star or its counsel was

responsible for not producing Madden for deposition. *See Spohn Hosp.*, 104 S.W.3d at 882–83.

The record reflects that appellees first sought to depose Madden in 2011. In 2011 or 2012, after Madden went on medical leave or disability, Star de-designated him as its expert on damages. In 2015, Star re-designated Madden as its expert on damages and filed his expert report.

On July 5, 2016, the trial court issued an order compelling Verhage, Madden, NLW, and Inner Belt to appear for depositions within 21 days. The parties conferred and determined that the depositions could not be completed within 21 days because of scheduling conflicts. On July 20, 2016, the parties entered into a Rule 11 Agreement, in which they agreed that Star would produce Verhage for deposition on July 29, 2016; that NLW would produce its representative for deposition on August 1; that Star would produce Madden for deposition on August 16, 2016; and that Inner Belt would produce its representative for deposition on August 17, 2016.

At the hearing on appellees' motion to exclude Madden's testimony and for summary judgment on the damages issue, Star argued that, after it produced Verhage for deposition, as agreed, appellees breached the Rule 11 Agreement by presenting Parker, who was not a competent corporate representative of NLW because he admitted that he was not an employee, owner, or contractor of NLW and he demonstrated a lack of knowledge of any relevant information. Star also complained

that, during Parker's deposition, NLW asserted frivolous objections to entire categories of questions. Thus, Star terminated the deposition and refused to produce Madden until appellees honored the agreement. Star filed a motion to compel NLW to present a proper corporate representative and filed a motion for protection, requesting that the trial court prohibit any further depositions until NLW complied. However, the trial court denied Star's motions. When the trial court noted that Star had not made its production of Madden contingent on appellees honoring the Rule 11 Agreement, Star responded that the remedy for such was a breach-of-contract claim by appellees, not a death penalty sanction by the trial court.

After the trial court denied Star's motion for protection on September 12, 2016, Star did not immediately produce Madden for deposition. On November 7, 2016, with trial set for February 13, 2017, Star emailed appellees about completing the depositions of Madden, NLW, and Inner Belt.

In a January 2, 2017 letter to the trial court, Star stated that, at a December 1, 2016 status conference, the trial court had ordered Star to produce Madden for deposition *if the parties' mediation on January 7, 2017 was unsuccessful.* Star explained that the mediator had canceled due to illness and that the mediation had been rescheduled for January 9. Star again asked the trial court to advise regarding its order to produce Madden for deposition. On January 6, 2017, Star notified the trial court that the mediator was still ill, that the mediation had been rescheduled for

21

January 23, and that Star had attempted unsuccessfully to confer with appellees regarding scheduling mediation sooner with another mediator. Star asked the trial court to advise regarding its order to produce Madden for deposition by January 7. On January 12, 2017, Star requested an emergency hearing in the trial court regarding its order to produce Madden for deposition. Star asserted that it had offered to produce Madden for deposition on January 11, however, appellees had declined to proceed with deposing Madden. On January 24, 2017, Star notified the trial court that mediation had been completed but was unsuccessful. Star noted that it had again offered Madden for deposition on January 25 and that appellees had declined. Appellees, in a letter to the trial court, re-urged their motion for summary judgment and asserted that Madden's expert report should be excluded.

On February 21, 2017, the trial court excluded Madden's testimony for failing to appear for deposition and granted appellees' motion for no-evidence summary judgment on the damages element of Star's breach-of-contract claim, based on the ESA. Thus, the sanction imposed terminated the presentation of the merits of Star's claim. As in *TransAmerican*, however, it is not clear whether Star or its counsel was, or should have been, faulted for Madden's failure to appear for his deposition. 811 S.W.2d at 917–18 (holding that record must contain evidence that sanctions were "visited on the offender"); *see, e.g.*, *Gunn v. Fuqua*, 397 S.W.3d 358, 374 (Tex. App.—Dallas 2013, pet. denied) (noting that trial court made no finding that party

22

was personally responsible for failure of counsel to fully comply with discovery rules or orders in case). The record does not show that the trial court attempted to determine whether the offensive conduct was attributable to counsel only, to Star only, or to both. *See Spohn Hosp.*, 104 S.W.3d at 882–83; *TransAmerican*, 811 S.W.2d at 917–18.

We conclude that, although striking the testimony of Star's sole expert witness on damages is related to his failure to appear for his deposition, generally directed at the abuse, and aimed at remedying the harm, the record does not establish that it was imposed on the offender. *See id.*

**B.     *Excessive Sanctions***

Again, the second prong of the *TransAmerican* analysis "mandates that the trial court consider less stringent measures before settling on severe sanctions." *Spohn Hosp.*, 104 S.W.3d at 883. Thus, "the record should contain some explanation of the appropriateness of the sanctions imposed." *Id.* In all but the most exceptional cases, the trial court must actually test the lesser sanction. *Cire*, 134 S.W.3d at 841.

In *TransAmerican*, the trial court imposed merits-preclusive sanctions against the plaintiff after its president failed to present himself for his deposition. 811 S.W.2d at 915–16. The supreme court concluded that "[n]othing in the record before [it] even approache[d] justification for so severe a sanction." *Id.* at 918–19. There, with 30 days remaining in the discovery period, the parties were repeatedly unable

to agree upon a date for the president's deposition. *See id*. at 915. The plaintiff ascribed its failure to produce its president to miscommunications concerning schedule changes. *Id.* The defendant alleged that his failure to appear was purposeful and part of the plaintiff's intentional obstruction of the discovery process. *Id.* After each sought sanctions against the other, the trial court signed an order striking the plaintiff's pleadings. *See id.* at 915–16.

The supreme court concluded in *TransAmerican* that nothing in the record indicated that the trial court had considered the imposition of lesser sanctions or that such sanctions would not have been effective. *Id.* at 918. If anything, the court concluded, the record "strongly suggest[ed] that lesser sanctions should have been utilized and probably would have been effective." *Id.* The court noted that the trial court could have ordered the president's deposition for a specific date and punished any failure to comply with that order by contempt or another sanction. *Id.* Further, the trial court could have taxed the costs of the deposition and assessed attorney's fees against the plaintiff. *Id.* ("The range of sanctions available to the district court under Rule 215 is quite broad.").

Here, the trial court's order excluded the testimony of Star's sole expert witness on damages "for failing to appear for his deposition without good cause consistent with [the] July 5, 2016 order of the court compelling his appearance and the Rule 11 agreement, dated July 20, 2016." However, the July 5, 2016 order

24

requires both parties to produce witnesses for deposition and does not expressly address or impose any sanctions. Although the parties had a Rule 11 Agreement, each was required to produce witnesses for deposition, neither complied, and Star explained that appellees breached the agreement prior to the agreed date of Madden's deposition. Generally, the remedy for a breach of a Rule 11 agreement is a breach-of-contract claim filed by a party. *See In re Build by Owner, LLC*, No. 01-11-00513-CV, 2011 WL 4612790, at \*7 (Tex. App.—Houston [1st Dist.] Oct. 6, 2011, no pet.) (mem. op.) (holding Rule 11 agreement enforced by breach-of-contract claim); *see also Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex. 1995) (holding courts construe Rule 11 agreements as any other contract).

The record before us does not reflect that the trial court attempted lesser sanctions and does not contain an explanation of the appropriateness of the sanction imposed or the effectiveness of less stringent sanctions. *See Cire*, 134 S.W.3d at 841; *Spohn Hosp.*, 104 S.W.3d at 883 (holding that record should contain some explanation of appropriateness of sanctions imposed and that record was silent regarding consideration and effectiveness of less stringent sanctions); *Occidental Chem. Corp. v. Banales*, 907 S.W.2d 488, 490 (Tex. 1995) (vacating trial court's order compelling production of attorney's notes from witness interviews as remedy for discovery abuse because there was no showing why less severe sanctions would not have cured abuse). The trial court could have ordered Madden's deposition for

25

a specific date and punished any failure to comply with that order by contempt or another sanction, or the trial court could have taxed the costs of the deposition and assessed attorney's fees against Star. *See TransAmerican*, 811 S.W.2d at 918 ("The range of sanctions available to the district court under Rule 215 is quite broad."); *see also* TEX. R. CIV. P. 215.2(a). Based on Star's attempts to present Madden for deposition, the record suggests, as in *TransAmerican*, that lesser sanctions "probably would have been effective." *See id.*

In particularly egregious cases, a trial court may order death penalty sanctions without first testing lesser sanctions, but no evidence demonstrates that this is such a case. *See Gunn*, 397 S.W.3d at 375 (holding that, although record contained evidence of dilatoriness on counsel's part, sanctions imposed were excessive); *cf. Cire*, 134 S.W.3d at 838, 842–43 (demonstrating exceptional case in which death penalty sanctions were upheld after single lesser sanction directed only at counsel after party disregarded four discovery orders to produce certain evidence and then deliberately destroyed evidence).

Discovery sanctions may not "adjudicate the merits of a party's claims or defenses unless a party's hindrance of the discovery process justifies a presumption that the party's claims or defenses lack merit" or "absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules." *TransAmerican*, 811 S.W.2d at 918; *Daniel v. Kelley Oil Corp.*, 981 S.W.2d 230,

26

234–35 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). We conclude that the record here does not warrant such a presumption. *See TransAmerican*, 811 S.W.2d at 917–18.

Because the trial court's order does not comply with the procedural and substantive requirements for imposing such sanctions, we hold that the trial court erred in ordering that the testimony of Madden, Star's sole expert on liquidated damages, be excluded.

We further conclude that the trial court's error was harmful. *See* TEX. R. APP. P. 44.1; *Spohn Hosp.*, 104 S.W.3d at 883. The trial court, although having previously granted summary judgment in favor of Star on the liability portion of its claim against Northpark for breach of the ESA, precluded Star's ability to present the merits of the damages element of its claim by excluding the testimony of its sole expert on damages. Appellees moved for a summary judgment, arguing that they were entitled to judgment as a matter of law on Star's breach-of-contract claim because, without Madden's testimony, Star had no evidence of the damages element. The trial court granted summary judgment in favor of appellees, noting in its order that Madden's testimony was excluded. Thus, the exclusion of Madden's testimony was outcome determinative and harmful.

Accordingly, we sustain Star's first issue.

27

**Summary Judgment**

In its second, third, and fourth issues, Star challenges the trial court's summary judgments in favor of appellees. In its second issue, Star argues that the trial court erred in granting appellees' motion for no-evidence summary judgment on the damages element of Star's breach-of-contract claim. *See* TEX. R. CIV. P. 166a(i). Also under its second issue, Star argues that the trial court erred in granting appellees' motion for traditional summary judgment on their affirmative defense of accord and satisfaction. *See* TEX. R. CIV. P. 166a(c). In its fourth issue, Star argues that the trial court erred in granting appellees' motion, and erred in denying Star's motion, for traditional summary judgment on Star's fraudulent transfer claims. *See id.* In its third issue, Star argues that the trial court erred in granting appellees' motion for traditional summary judgment and dismissing all of Star's remaining claims based on the doctrine of res judicata. *See id.*

*Standard of Review and Principles of Law*

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). In conducting our review, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating*, 164 S.W.3d at 661; *Provident Life & Accident Ins.*, 128 S.W.3d at 215. If a trial court grants

28

summary judgment without specifying the grounds for granting the motion, we must uphold the trial court's judgment if any of the asserted grounds are meritorious. *Beverick v. Koch Power, Inc*., 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

A party seeking summary judgment may combine in a single motion a request for summary judgment under the traditional and no-evidence standards. *Binur v. Jacobo*, 135 S.W.3d 646, 650–51 (Tex. 2004); *see also* TEX. R. CIV. P. 166a(c), (i). When a party has sought summary judgment on both grounds and the trial court's order does not specify its reasons for granting summary judgment, we first review the propriety of the summary judgment under the no-evidence standard. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004); *see also* TEX. R. CIV. P. 166a(i). If we conclude that the trial court did not err in granting summary judgment under the no-evidence standard, we need not reach the issue of whether the trial court erred in granting summary judgment under the traditional standard. *See Ford Motor Co*., 135 S.W.3d at 600; *see also* TEX. R. CIV. P. 166a(c).

To prevail on a motion for no-evidence summary judgment, the movant must establish that there is no evidence to support an essential element of the non-movant's claim on which the non-movant would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex. App.— Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the non-movant to

present evidence raising a genuine issue of material fact as to each of the elements challenged in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Hahn*, 321 S.W.3d at 524. A no-evidence summary-judgment may not be granted if the non-movant brings forth more than a scintilla of evidence to raise a genuine issue of material fact on the challenged elements. *See Ridgway*, 135 S.W.3d at 600. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

In a traditional summary-judgment motion, the movant has the burden to show that no genuine issue of material fact exists and the trial court should grant judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). When a plaintiff moves for summary judgment on its own claim, the plaintiff must conclusively prove all essential elements of its cause of action. *Rhône–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999). When a defendant moves for a traditional summary judgment, it must either: (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of an affirmative defense, thereby defeating the plaintiff's cause of action. *See Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995); *Lujan v. Navistar Fin. Corp.*, 433 S.W.3d 699, 704 (Tex.

30

App.—Houston [1st Dist.] 2014, no pet.). Once the movant meets its burden, the burden shifts to the non-movant to raise a genuine issue of material fact precluding summary judgment. *See Siegler*, 899 S.W.2d at 197. The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

## I.      Breach-of-Contract Damages

The trial court previously granted summary judgment for Star on the liability portion of its claim against Northpark for breach of the ESA. In its second issue, Star argues that the trial court erred in granting appellees' motion for no-evidence summary judgment on the damages element of its claim because Star presented more than a scintilla of evidence to support its claim. *See* TEX. R. CIV. P. 166a(i). Star also argues that the trial court erred in granting appellees' motion for traditional summary judgment on the damages issue because appellees did not conclusively establish their right to judgment on their affirmative defense of accord and satisfaction. *See* TEX. R. CIV. P. 166a(c).

### A.      *No-evidence Summary Judgment*

In its petition, Star sought damages for (1) Northpark's failure to pay for the electricity services it received under the ESA and (2) Northpark's failure to pay the

agreed liquidated damages, or ETF, for terminating the ESA prior to the end of its term.

In their joint motion for no-evidence summary judgment, appellees argued that Star could show "no evidence" of the amount due for electricity services under the ESA because "its records continually produced inconsistent numbers." Appellees further argued that Star "had no evidence supporting its liquidated damages claim" and that "inconsistent testimony concerning the amount of the liquidated damages demonstrate[d] that such amount cannot be accurately calculated."[7] *See id.* Appellees' assertion that Star could show no evidence of damages, an essential part of its breach-of-contract claim, shifted the burden to Star to produce more than a scintilla of probative evidence to raise a fact issue. *See id.*; *Ridgway*, 135 S.W.3d at 600.

---

[7] In their motion for summary judgment on Star's breach-of-contract claim, appellees also asserted that they were entitled to judgment as a matter of law because there was no evidence that any person or entity other than Northpark was a party to the ESA. Star's petition reflects, however, that its claim for breach of the ESA was against Northpark. Star's claims against Choudhri and Jetall were under corporate veil piercing theories, and Star did not assert a claim for breach of the ESA against another person or entity. Appellees further asserted that they were entitled to judgment because Star could not recover damages under any theory asserted in its petition, except as expressly provided in the ESA. Appellees asserted that, pursuant to the terms of the ESA, the contract remedies therein are exclusive and all others are waived. The record reflects, however, that, with respect to the breach-of-contract claim at issue, Star sought the types of damages expressly set forth in the ESA. Even were we to conclude that appellees, as non-signatories to the ESA, could collectively benefit from any waiver provision contained therein, waiver constitutes an affirmative defense that appellees would have borne the burden to establish. *See* TEX. R. CIV. P. 94.

32

Star, in its response, argued that Verhage's testimony, even if inconsistent, constituted some evidence of its damages for unpaid electricity services. In addition, Madden's expert report constituted some evidence of its liquidated damages. As its summary-judgment evidence, Star attached the ESA, its "Supplier Agreement" with Luminant, its monthly invoices to Northpark for electricity services, its Amended Responses to Appellees' Requests for Disclosure, Verhage's affidavit and deposition testimony, and Madden's expert report on damages. Appellees objected, on various grounds, to the ESA, Supplier Agreement, Star's invoices, Verhage's affidavit, and Madden's expert report. And, the trial court sustained their objections.

### 1. *Summary Judgment Evidence*

In a sub-point under this issue, Star argues that, "[a]s a threshold matter, the trial court erred in sustaining appellees' objections to [Star's] evidence." However, it specifically challenges only Verhage's affidavit and Madden's expert report.

Appellees objected to the ESA and Supplier Agreement on the basis of hearsay and objected to Star's monthly invoices on the ground that they lacked authentication. The trial court sustained these objections, and Star does not specifically challenge them on appeal. Thus, we do not consider this evidence. Further, Star's own responses to Appellees' Requests for Disclosure do not constitute competent summary judgment evidence. *See* TEX. R. CIV. P. 197.3 (stating answers to interrogatories may only be used against responding party); *Yates v.*

33

*Fisher*, 988 S.W.2d 730, 731 (Tex. 1998); *Stauder v. Nichols*, No. 01-08-00773-CV, 2010 WL 2306385, at *7 (Tex. App.—Houston [1st Dist.] June 10, 2010, no pet.) (mem. op.).

Appellees objected to Verhage's affidavit on the ground that it constituted a "sham affidavit" because it conflicts with Verhage's deposition testimony, in which he claimed a lack of knowledge of how Star's damages were to be calculated, and he could not explain why he testified previously to different amounts. On appeal, Star argues that the trial court erred by sustaining appellees' objection to Verhage's affidavit because "nowhere in the affidavit does Verhage state that he is knowledgeable about how amounts are calculated under the Contract." Thus, there is no conflict and the affidavit is not a "sham."

This Court has held that a party cannot file an affidavit to contradict his own deposition testimony, without any explanation for the change in the testimony, for the purpose of creating a fact issue to avoid summary judgment. *Farroux v. Denny's Restaurants, Inc.*, 962 S.W.2d 108, 111 (Tex. App.—Houston [1st Dist.] 1997, no pet.). If a party's own affidavit contradicts his earlier testimony, the affidavit must explain the reason for the change. *Id.* (noting that affiant could explain that he was confused during deposition or had discovered additional, relevant materials afterwards). Without an explanation for the change in the testimony, the court

assumes that the sole purpose of the affidavit is to avoid summary judgment. *Id.* As such, it presents merely a "sham" fact issue. *Id.*

Here, in his affidavit, Verhage testified that he was the Director of Credit and Collections of Star during the time of the events and circumstances at issue, and that the facts stated in the affidavit were within his personal knowledge and were true and correct. Our review reflects that, with respect to damages, Verhage, in his affidavit, which is presented in detail below, does not attempt to calculate damages, explain how damages were calculated, or claim personal knowledge of how damages were calculated. Thus, the record does not support appellees' asserted conflict between Verhage's affidavit testimony and his deposition testimony, the complained-of portions of which appellees do not identify. Because the record does not support appellees' objection to the admissibility of Verhage's affidavit, the trial court erred in sustaining appellees' objection to the affidavit.

With respect to Madden's expert report, appellees objected on the ground that it was not verified. On appeal, Star argues that the trial court erred by sustaining appellees' objection because Madden's report was verified. In order to constitute competent summary judgment evidence, an expert report must be verified. *Kolb v. Scarbrough*, No. 01-14-00671-CV, 2015 WL 1408780, at *4 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (mem. op.) (holding that expert report, to which nonmovant failed to attach affidavit or otherwise authenticate, did not constitute competent

summary judgment evidence to defeat no-evidence motion). The record shows that Madden's expert report is verified by attached affidavit. Thus, the record does not support appellees' objection, and the trial court erred in sustaining it.

### 2. *Summary Judgment*

To support its damages claims, Star was required to present more than a scintilla of evidence of its unpaid invoices and early termination fees. *See* TEX. R. CIV. P. 166a(i). Again, more than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharm.*, 953 S.W.2d at 711.

With respect to Star's claim for damages based on its unpaid invoices, we first note that, because the trial court sustained appellees' objection to Star's invoices, we must consider whether Star presented other evidence of its unpaid invoices sufficient to raise a fact issue. By analogy, in *MeadWestvaco Corp. v. Way Service*, the court upheld a jury's finding that a defendant owed $254,196.48 for three unpaid invoices and a $8,609.88 termination fee based on a manager's testimony. No. 09-15-00014-CV, 2016 WL 421303, at *2 (Tex. App.—Beaumont Feb. 4, 2016, no pet.) (mem. op.). There, the plaintiff's general manager testified that the defendant did not pay the plaintiff's invoices for November 2010, December 2010, or January 2011 in the amount of $84,732.16 each. *Id.* And, notably, the defendant admitted that it had failed to pay the invoices. *Id.* The court held that a jury could reasonably conclude

36

that the defendant breached the contract by failing to pay the undisputed invoices and that the plaintiff was entitled to $254,196.48, an amount that represented the three unpaid invoices. *Id.*

Here, Star's summary-judgment evidence shows that Verhage, in his affidavit, testified regarding Star's unpaid invoices as follows:

6. On or about September 3, 2008, [Star] entered into an [ESA] with Northpark, wherein [Star] agreed to provide electricity to the [Property] at a rate of 8.97 cents per kilowatt hour for 60 months. . . .

7. At about the time the [ESA] was executed, [Star] went to its supplier to purchase enough power to service the full 60-month term. Specifically, [Star] entered into a [Supplier Agreement], whereby it committed to purchasing a specific volume of energy unique to Northpark's consumption needs for a period of 60 months, beginning on or about the same time as the [ESA's] 60-month term . . . .

8. Thereafter, [Star] began serving the Property with electricity. [Star] also submitted monthly invoices to Northpark detailing the amount of electricity used and amounts owed for the same pursuant to the contractually agreed rate of 8.97 cents per kilowatt hour. A true and correct copy of [Star's] monthly invoices to Northpark are attached as Exhibit "C" to [Star's] Response.

9. As reflected in the monthly invoices, Northpark timely paid each invoice up until mid-2010 when it began falling behind on its payments. . . .

10. . . . [Star] subsequently received a letter dated October 18, 2010 from Choudhri, as an authorized agent of Northpark. This letter stated that Northpark wished to terminate the [ESA] as of October 31, 2010.

11. At the time Choudhri terminated the [ESA], approximately 36 months remained in the original 60-month contractual term.

37

Additionally, Northpark owed an outstanding balance for unpaid electricity previously provided under the [ESA]. . . .

12.  . . . . [Star] treated Northpark's early termination and failure to pay as a breach of the [ESA]. As a result of such breach, [Star] incurred significant damages.

13.  To date, Northpark has failed and refuses to pay the amounts owed to [Star] under the [ESA]. This claim is within my personal knowledge and is just and true and is due and owing to [Star] from Northpark and all just and lawful offsets, payments, and credits have been allowed.

On appeal, appellees admit that they "tendered two cashier['s] checks in the amounts of $22,247.02 and $84,423.04" to Star for "unpaid electricity billed by [Star]." As Star argues, Verhage's affidavit testimony, coupled with such admission, constitutes more than a scintilla of evidence to raise a fact issue on Star's damages with respect to its unpaid invoices. *See MeadWestvaco*, 2016 WL 421303, at *2 (holding that testimony of plaintiff's manager coupled with defendant's admission of unpaid invoices constituted evidence sufficient to sustain jury finding at trial).

With respect to Star's claim for damages based on the termination fees, or ETFs, under the ESA, Star presented Madden's expert report. The term "liquidated damages" generally refers to an acceptable measure of damages that the parties stipulate in advance will be assessed in the event of a breach of their contract. *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 431 (Tex. 2005); *Triton 88, L.P. v. Star Elec., L.L.C.*, 411 S.W.3d 42, 61–63 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (holding that trial court did not err in granting summary judgment and awarding

Star $105,034.18 on its claim that Triton failed to pay for electricity provided under ESA and $197,323.25 as liquidated damages on its claim for Triton's early termination of ESA). Liquidated damages are given in lieu of actual damages and thus they are not considered future damages, even though aspects of the liquidated award may compensate the party for what would have otherwise been recovered as future losses. *See Lafarge Corp. v. Wolff, Inc*., 977 S.W.2d 181, 188 n.13 (Tex. App.—Austin 1998, pet. denied). Generally, to enforce a liquidated damages clause, the court must find that (1) the harm caused by the breach is incapable or difficult of estimation and (2) the amount of liquidated damages called for is a reasonable forecast of just compensation. *See id.*

Madden, in his "Report of Findings," states:

I have been asked to provide observations and opinions relevant to the damages incurred by [Star] resulting from [Northpark's] early termination of the retail electricity contract that Northpark entered into with [Star] on or about September 3, 2008. . . . I have reviewed various documents [listed] from [Star], along with transcripts of certain depositions taken in the present suit. I have also consulted SNL Financial for historical natural gas and power pricing information which further support my findings. Based on my review of this evidence, I conclude that [Star] incurred liquidated damages in the amount of $477,956.84 as a result of Northpark's early termination of the [ESA]. This amount does not include any amounts owed for unpaid usage or late fees. I further conclude that these damages are reasonable and comparable to industry standards.

Madden further explained that Star does not generate or transmit electricity; rather, it purchases energy from a wholesale supplier and sells it to end users.

39

Northpark agreed to purchase electricity from Star at a rate of 8.97 cents per kilowatt hour for 60 months. To fulfill this contract, Star contracted with its supplier, Luminant, to purchase a certain amount of electricity each month, for 60 consecutive months, according to forecasted 15-minute interval usage for Northpark's profile. Specifically, Star committed to purchase 18,775.852 megawatt hours at $83.80 per megawatt hour.

He explained that when a customer terminates a contract early, it is impossible to accurately calculate the total damages *actually realized* because the price of electricity may change every 15 minutes. In order to fully mitigate its damages, Star would have to find a new customer who not only agrees to pay the same fixed rate for the same term, but who also has the exact same volume requirements as the customer who terminated early. Thus, to compensate for the damages incurred, the ESA contains a liquidated damages provision.

Madden explained that, here, the ESA, paragraph 9, provides that an ETF is to be assessed as follows:

> The [ETF] shall be equal to any mark to market costs. For purposes of this Agreement, mark to market costs shall be calculated as . . . the difference between the costs of Energy procured by Star in order to satisfy the Customer's requirements under this ESA for the Customer's Service Location(s) and ESID(s) and the final net liquidated value of said Energy at the time of termination by Customer multiplied by the total amount of Energy procured for the Customer's Service Location(s) and ESID(s) for the remainder of the original Term of the ESA, as reasonably determined by Star.

40

Finally, Madden applied the agreed model in the ESA:

> In my opinion, paragraph 9 provides for a fair and reasonable compensation in the event of an early termination, particularly because it limits the fee to the "net liquidated value" rather than charging all the margin costs actually realized by [Star] when liquidating. In my opinion, "net liquidated value" simply refers to how much it would cost [Star] to sell back the remaining volume of energy to Luminant at the time Northpark terminated.

> Based on the formula in paragraph 9, I conclude that Northpark incurred $477,956.84 in ETFs. This represents the amount calculated at the time of the termination as [Star] consulted with Luminant to determine the amount that would be due and payable from [Star] to Luminant in the event that [Star] requested to sell back to Luminant all of the remaining volumes under the terms of this agreement. In applying the formula from paragraph 9, this amount would be equal to the difference between the original cost of the electricity purchased from Luminant equal to $83.80/MWH and the then-current value of the remaining volumes of electricity purchased from Luminant equal to $40.98/MWH multiplied by the remaining volume equal to 11,162 MWH.

Thus, the liquidated damages provision in the ESA required evidence of the cost of the energy that Star obtained from Luminant to satisfy Star's contract with Northpark, which Madden testified was 18,775.852 megawatt hours at $83.80 per megawatt hour. The model also required the liquidated value of the energy at the time of termination and the total amount of energy for the remainder of the term, which Madden testified was $40.98 per megawatt hour multiplied by the remaining volume of 11,162.00 megawatt hours. Madden concluded that plugging these values into the formula yielded total damages of $477,956.84.

We conclude that Star presented more than a scintilla of probative evidence to raise a genuine issue of material fact on the liquidated damages element of its claim. *See also Port of Hous. Auth. of Harris Cty. v. Zachry Constr. Corp.*, 513 S.W.3d 543, 559 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (concluding that expert's damages model was not unreliable based on conflicting evidence, which was for jury to resolve); *Am.'s Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 629 (Tex. App.—San Antonio 1996, writ denied) (upholding damages for lost profits in breach of contract case despite varying assumptions in parties' competing damages models).

Accordingly, to the extent that the trial court granted summary judgment on the damages issue in favor of appellees based on their no-evidence motion, we hold that the trial court erred.

## B. *Traditional Summary Judgment*

In their motion for traditional summary judgment on damages, appellees argued that they are entitled to judgment because they established, as a matter of law, their affirmative defense of accord and satisfaction. *See* TEX. R. CIV. P. 94, 166a(c). Appellees assert that they tendered cashier's checks to Star, in the amounts of $22,247.02 and $84,423.04, that were not returned, and thus they have paid "any sums that [Star] could establish due and owing."

42

As both the party asserting the affirmative defense and the movant for summary judgment, appellees bore the burden to conclusively establish their defense as a matter of law. *Richardson v. Allstate Tex. Lloyd's*, 235 S.W.3d 863, 865 (Tex. App.—Dallas 2007, no pet.) (citing *Jenkins v. Henry C. Beck Co.*, 449 S.W.2d 454, 455 (Tex. 1969)). Accord and satisfaction exists when parties agree to discharge "an existing obligation in a manner other than in accordance with the terms of their original contract." *Avary v. Bank of Am., N.A.*, 72 S.W.3d 779, 788 (Tex. App.—Dallas 2002, pet. denied). The defense involves a new contract, either express or implied, in which the existing obligation is released by agreement of the parties through "means of [a] lesser payment tendered and accepted." *Jenkins*, 449 S.W.2d at 455. Evidence offered in support of the defense must demonstrate that both parties agreed that the amount the debtor paid "*fully satisfied the entire claim.*" *Avary*, 72 S.W.3d at 788 (emphasis added). Because a valid accord and satisfaction depends upon an agreement, "it only occurs when the parties mutually [assent] to it, and their intention is a controlling element." *Richardson*, 235 S.W.3d at 865 (internal quotations omitted).

Appellees, in their motion for summary judgment, did not argue or present any evidence of such an agreement with Star. *See id.* To the contrary, appellees asserted in their motion and on appeal, and it is undisputed, that Star did not accept appellees' payments. Accordingly, to the extent that the trial court granted summary

judgment in favor of appellees based on their affirmative defense of accord and satisfaction, we hold that the trial court erred.

We sustain Star's second issue.

## II. Fraudulent Transfer

In its fourth issue, Star argues that the trial court erred, in part, in granting appellees' motion for traditional summary judgment on Star's fraudulent transfer claim because appellees did not conclusively establish their affirmative defense, i.e., that Star's claim was extinguished by the statute of repose. *See* TEX. BUS. & COM. CODE § 24.010; TEX. R. CIV. P. 166a(c). Also under its fourth issue, Star asserts that the trial court erred in denying its own motion for summary judgment on its fraudulent transfer claim. *See* TEX. R. CIV. P. 166a(c).

### *Legal Principles*

The purpose of TUFTA is to prevent debtors from prejudicing creditors by improperly moving assets beyond their reach. *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016); *Wohlstein v. Aliezer*, 321 S.W.3d 765, 776 (Tex. App.—Houston [14th Dist.] 2010, no pet.). TUFTA permits a creditor, under certain circumstances, to set aside a debtor's fraudulent transfer of assets. *See* TEX. BUS. & COM. CODE § 24.008; *Goebel v. Brandley*, 174 S.W.3d 359, 362 (Tex. App.— Houston [14th Dist.] 2005, pet. denied). A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or

within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COM. CODE § 24.005(a). Under TUFTA, a "debtor" is "a person who is liable on a claim." *Id.* § 24.002(6). A "creditor" is "a person . . . who has a claim." *Id.* § 24.002(4). A "person" includes an "individual, partnership, corporation, association, organization, government or governmental subdivision or agency, business trust, estate, trust, or any other legal or commercial entity." *Id.* § 24.002(9). A "claim" is a "right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 24.002(3). "Reasonably equivalent value" is defined as including a transfer that is within the range of values for which the transferor would have sold the asset in an arm's length transaction. *Id.* § 24.004. A "transfer" includes "every mode . . . of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and

45

creation of a lien or other encumbrance." *Id*. § 24.002(12). Facts and circumstances that may be considered in determining fraudulent intent include a nonexclusive list of "badges of fraud" prescribed by the legislature.[8]

TUFTA provides that "a cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless [the] action is brought," as applicable here, "within four years after the transfer was made or the obligation was incurred." *Id.* § 24.010. Section 24.010 is to be strictly construed and constitutes a statute of repose, rather than a statute of limitations. *Cadle Co. v. Wilson*, 136 S.W.3d 345, 350 (Tex. App.—Austin 2004, no pet.); *see Nathan v. Whittington*, 408

---

[8]    Such "badges of fraud" include that:

(1)    the transfer or obligation was to an insider;
(2)    the debtor retained possession or control of the property transferred after the transfer;
(3)    the transfer or obligation was concealed;
(4)    before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5)    the transfer was of substantially all the debtor's assets;
(6)    the debtor absconded;
(7)    the debtor removed or concealed assets;
(8)    the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9)    the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10)   the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11)   the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE § 24.005(b). The presence of several of these factors is sufficient to support a fact finder's reasonable inference of fraudulent intent. *Qui Phuoc Ho v. MacArthur Ranch, LLC*, 395 S.W.3d 325, 329 (Tex. App.—Dallas 2013, no pet.).

S.W.3d 870, 874 (Tex. 2013). "[W]hile statutes of limitations operate procedurally to bar the enforcement of a right, a statute of repose takes away the right altogether, creating a substantive right to be free of liability after a specified time." *Nathan*, 408 S.W.3d at 873 (quoting *Methodist Healthcare Sys. of San Antonio, Ltd. v. Rankin*, 307 S.W.3d 283, 287 (Tex. 2010)) ("Unlike a statute of limitations, a statute of repose not only 'procedurally bar[s] an untimely claim, it substantively extinguishes the cause of action."). "Statutes of repose are of an absolute nature, and their key purpose . . . is to eliminate uncertainties under the related statutes of limitations and to create a final deadline for filing suit that is not subject to any exceptions, except perhaps those clear exceptions in the statute itself." *Id.* (internal quotations omitted). Section 24.010 "bars the right and not merely the remedy." *Cadle Co.*, 136 S.W.3d at 350 (citing UNIF. FRAUDULENT TRANSFER ACT § 9 cmt. 1, 7A pt. II U.L.A. 266, 359 (1999)). "The periods prescribed apply . . . whether the action is brought against the original transferee or subsequent transferee." UNIF. FRAUDULENT TRANSFER ACT § 9 cmt. 2, 7A pt. II U.L.A. 555 (2017).

### A.    *Appellees' Motion for Summary Judgment*

Here, in their motion for traditional summary judgment, appellees asserted that the "only transfer" that Star "alleged to have been made by [Northpark]" was its October 27, 2010 transfer of the Property to NLW, that an action on such transfer is extinguished by the statute of repose, and that "[a]ny other claim of fraudulent

47

transfer either does not involve Northpark, and/or is barred by the statute of repose." *See* TEX. R. CIV. P. 166a(c).

Appellees asserted that Star's fraudulent transfer claim against Northpark was subject to a four-year statute of repose. And, because Star dropped its original claim from its pleadings, effectively non-suiting it, and did not reassert it until after the repose period expired, Star's claim was extinguished. As their summary-judgment evidence, appellees presented Star's third, seventh, eighth, and ninth amended petitions.

The evidence shows that, in its third amended petition, which it filed on February 2, 2011, Star alleged that Northpark's transfer of the Property to NLW constituted a fraudulent transfer under TUFTA. In its seventh amended petition, which it filed on June 25, 2012, Star alleged several common-law-fraud claims against appellees, but did not include a statutory fraudulent transfer claim. By omitting its fraudulent transfer claim altogether from its seventh petition, Star nonsuited its claim as if it had filed a notice of nonsuit with the trial court. *See FKM P'ship v. Bd. of Regents of the Univ. of Hous. Sys.*, 255 S.W.3d 619, 632 (Tex. 2008) (filing amended petition that does not include cause of action nonsuits or voluntarily dismisses omitted claim as of time pleading is filed). Star did not include a fraudulent transfer claim in its eighth amended petition. In its ninth amended

48

petition, which it filed on June 19, 2015, Star re-asserted its fraudulent transfer claims as follows:

> **[Northpark] transferred the Property to NLW on or about October 27, 2010 in violation of Chapter 24 of the Texas Business & Commerce Code.**  Specifically, the Property was [Northpark's] sole asset.  It was transferred to NLW the day [Star] filed the present suit with actual intent to hinder, delay or defraud [Star].  Moreover, [Northpark] transferred the Property without receiving any reasonably equivalent value in exchange, thereby leaving it entirely devoid of its ability to satisfy any judgment obtained by [Star] in this matter.
>
> **Further, immediately after the Property was transferred, NLW encumbered it with the Deed of Trust to FCCU in exchange for a $6.5M loan.**  Portions of these monies were transferred to AIGWT and flowed directly to Choudhri, Naeem and Shahnaz in order to purchase additional parcels of property through various other entities, including Thousand Oaks and North Belt. **Additionally, NLW sold the Property to DS 1415 during the prosecution of this suit.**
>
> . . . . Accordingly, [Star] is entitled to attachment of the Property and/or all subsequent real property, assets or cash purchased with any monies received as a result of the transfer.   [Star] is further entitled to attachment of all proceeds realized or subsequent assets obtained by NLW following its sale of the Property to DS 1415.

(Emphasis added.)

Thus, in its ninth amended petition, Star first complains about Northpark's transfer of the Property to NLW on October 27, 2010.  The four-year statute of repose applicable to that claim expired on October 27, 2014.  *See* TEX. BUS. & COM. CODE § 24.010.  Because Star did not reassert its claim until it filed its ninth amended petition over seven months later, on June 9, 2015, the evidence establishes that Star's fraudulent transfer claim against Northpark was extinguished by the statute of

49

repose. *See id*.; *Nathan*, 408 S.W.3d at 873–74. Because appellees established their initial burden on their affirmative defense, the burden shifted to Star to present evidence creating a fact issue on at least one element of the defense. *See Siegler*, 899 S.W.2d at 197.

On appeal, Star "concede[s] that Northpark'[s] transfer of the [Property] to NLW on October 27, 2010 was subject to the Statute of Repose" and does not argue that a fact issue exists. Thus, we conclude that appellees conclusively established their affirmative defense with respect to Star's fraudulent transfer claim against Northpark. We hold that the trial court did not err in granting summary judgment dismissing Star's fraudulent transfer claim against Northpark.

Star argues that the trial court erred by dismissing its fraudulent transfer claim against NLW because its claim was filed within the statute of repose. *See* TEX. BUS. & COM. CODE § 24.010. Star alleged that NLW fraudulently transferred the Property to DS 1415 Houston, LLC ("DS 1415")[9] "on or about January 10, 2012" and fraudulently transferred sales proceeds to Choudhri and Naeem on February 2, 2012.

Again, in their motion for summary judgment, appellees asserted only that, as Star's claim against Northpark is barred by the statute of repose, "[a]ny other claim of fraudulent transfer" is likewise barred.

---

[9] DS 1415 is not a party to this case.

At the summary judgment hearing, Star argued that even if its claim against Northpark was extinguished, it had "asserted [claims of] fraudulent transfer as to multiple transfers that ha[d] occurred even since the inception of this lawsuit; and some of those [fell] within the requisite time period."

Appellees argued:

> There are some transfers that if they were transfers from Northpark would be within the time period, but they aren't transfers by Northpark. And they're alleged transfers by these other people who are alleged to be alter egos. Since the Court has granted summary judgment on alter ego, these parties are not debtors or transfer—or going to be responsible for the debt.[10]

> The only party that could be responsible is [Northpark]. Those are the only so-called debtors. So, these later transfers by Choudhri to somebody else have no bearing, and that was one of the grounds in our summary judgment [motion] is that there was no showing of a debt . . . . If the first—but the first theory of fraudulent transfer—the first transfer is definitely barred by the statute of repose. All the later supposed transfers are not by the debtor.

Star argued that "all of these parties were parties to this lawsuit," that Star had claims against them, apart from its claims against Northpark, and that whether Star had reduced its claims to final judgment had no bearing. Rather, Star simply had to have claims, as defined under TUFTA, and a debtor-creditor relationship.

The trial court concluded that once the initial transfer, i.e., from Northpark to NLW, was barred by repose, then any subsequent transfer was likewise barred:

---

[10] Whether, under Star's alter ego theories, the corporate forms of Northpark, Jetall, NLW, AIGWT, Thousand Oaks, North Belt, and Inner Belt should be disregarded and Choudhri, Naeem, and Shahnaz held personally liable is a different question

51

[A]s to the original fraudulent transfer, if that's been extinguished, then you don't have the links in the chain—you don't have a fraudulent transfer claim against these subsequent entities unless you have a creditor/debtor relationship with those later entities, right?

So, you know, ABC, Inc., transfers a property to DEF, Inc. It doesn't really matter unless ABC has a—unless they have a—they owe you something, right? There's some liability there, and they shouldn't be transferring the assets to another subsequent entity. So, you can't just jump to those entities. You have to build those links in the chain from the original transfer. If that original transfer is extinguished, then— then we're done . . . [.]

In its order granting appellees' motion for summary judgment, the trial court dismissed Star's "claims of Fraudulent Transfer related to the electric services agreement [ESA]." At a subsequent hearing on a motion to clarify its written order, the trial court explained that its order applied to claims arising from the ESA and to "every other transfer down the line."

Section 24.009, "Defenses, Liability, and Protection of Transferee," provides that, "to the extent a transfer is voidable in an action by a creditor," under section 24.008(a)(1),[11] "the creditor may recover judgment for the value of the asset

---

[11] Section 24.008, "Remedies of Creditors," provides, in pertinent part, as follows:

(a) In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in Section 24.009 of this code, may obtain:

   (1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

   . . . .

transferred . . . or the amount necessary to satisfy the creditor's claim. . . ." TEX.

BUS. & COM. CODE § 24.009(b). The judgment may be rendered against:

(1) the first transferee of the asset or the person for whose benefit the transfer was made; or

(2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

*Id.* Thus, to the extent that a creditor demonstrates that a debtor has violated

TUFTA, its remedies are against the debtor, the first transferee, or any subsequent

transferee. *See Osadon v. C & N Renovation, Inc*., No. 05-17-00453-CV, 2018 WL

2126821, at *4 (Tex. App.—Dallas May 9, 2018, pet. denied) (mem. op.) ("If C&N

proves a violation, it may recover from ANR (the person for whose benefit the

transfer was made), KLT (the first transferee), and from any subsequent

transferee . . . other than a 'good faith transferee who took for value.'"); *Cohen v.*

*Tour Partners, Ltd*., No. 01-15-00705-CV, 2017 WL 1528776, at *7 (Tex. App.—

Houston [1st Dist.] Apr. 27, 2017, no pet.) (mem. op.) ("A creditor may obtain a

judgment directly against the debtor or, instead, against a TUFTA transferee.");

*Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 726 (Tex. App.—Houston [1st

Dist.] 2005, pet. denied) ("The expansive language of the UFTA's 'remedy' section

---

(b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

TEX. BUS. & COM. CODE § 24.008.

provides . . . a broad range of remedies that can be sought from subsequent transferees, . . . if they are found to have participated in the fraudulent transfer of assets.").

Accordingly, if a creditor's cause of action for a violation of TUFTA has been extinguished by repose, there can be no remedy against a transferee. *See Cadle Co.*, 136 S.W.3d at 350 (stating section 24.010 bars right and remedy); *see also* UNIF. FRAUDULENT TRANSFER ACT § 9 cmt. 2 ("The periods prescribed apply . . . whether the action is brought against the original transferee or subsequent transferee."). Here, once Star's cause of action against Northpark for a violation of TUFTA was extinguished by repose, there could be no remedy against NLW, as a transferee, as any such claim is likewise extinguished.

To the extent that Star's claim is against NLW as a transferee based on Northpark's violation of TUFTA, appellees established their affirmative defense. Thus, the burden shifted to Star to present evidence creating a fact issue on at least one element of the defense. *See Siegler*, 899 S.W.2d at 197.

Star asserts on appeal, as it did in its response in the trial court, that it is not seeking a remedy against NLW as a transferee based on Northpark's violation of TUFTA. Rather, Star asserts, its claim against NLW involves its wholly separate violations of TUFTA.

The summary-judgment evidence shows that Star, in its ninth amended petition, stated claims against NLW for fraudulent transfer, common-law fraud, and conspiracy, seeking actual and exemplary damages against it. Star's suit against NLW for fraud and conspiracy constitutes a claim, as defined under TUFTA. *See* TEX. BUS. & COM. CODE § 24.002(3) (defining "claim" as "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured"). And, based on such claim, there existed a debtor-creditor relationship between Star and NLW. *See id.* §§ 24.002(4) (defining "creditor" as "a person . . . who has a claim"), 24.002(6) (defining "debtor" as "a person who is liable on a claim"), 24.002(9) (defining "person" to include "individual, partnership, corporation . . . or any other legal or commercial entity").

Star complains of NLW's transfer of the Property to DS 1415 and NLW's transfer of sales proceeds to Choudhri and Naeem. *See id.* § 24.002(12) (defining "transfer" to include "every mode . . . of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance"). Star asserts that NLW's transfers constituted fraudulent transfers because they were made while Star's claims were pending against NLW and were done "with actual intent to hinder, delay, or defraud" Star. *See id.* § 24.005(a)(1), (b); *see also Qui Phuoc Ho v. MacArthur Ranch, LLC*, 395

55

S.W.3d 325, 329 (Tex. App.—Dallas 2013, no pet.) (discussing reasonable inferences of fraudulent intent).

As its summary-judgment evidence to raise a fact issue on appellees' affirmative defense, Star presented the October 27, 2010 deed, in which Northpark transferred the Property to NLW, and a January 10, 2012 deed of trust, which DS 1415, as grantor, executed in favor of Arbor Realty SR, Inc. to secure a $9,000,000 loan against the Property.[12]  Star complains of NLW's interim transfer of the Property to DS 1415 and subsequent transfer of proceeds.

As discussed above, Star re-asserted its fraudulent transfer claim against NLW in its ninth amended petition filed on June 19, 2015.  Thus, to the extent that NLW's transfers took place after June 19, 2011, they are not extinguished.  *See* TEX. BUS. & COM. CODE § 24.010 (providing that cause of action is extinguished unless brought "within four years after the transfer was made or the obligation was incurred").

We conclude that Star presented evidence raising a fact issue as to whether its claims against NLW are extinguished by the statute of repose.  *See Siegler*, 899 S.W.2d at 197; *Goodyear Tire & Rubber Co.*, 236 S.W.3d at 755 (holding evidence raises genuine issue of fact if reasonable and fair-minded jurors could differ in their

---

[12]     Star explains that it relies on this evidence because NLW's transfer of the Property to DS 1415 was concealed and that no instrument evidencing the transfer was recorded. *See* TEX. PROP. CODE § 13.001 (governing unrecorded conveyances of interests in real property); *Fletcher v. Minton*, 217 S.W.3d 755, 758 (Tex. App.— Dallas 2007, no pet.).

conclusions). Because appellees did not conclusively establish their right to judgment on their affirmative defense with respect to NLW, we hold that the trial court erred in granting summary judgment dismissing Star's fraudulent transfer claims against NLW. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick*, 988 S.W.2d at 748. We sustain this portion of Star's fourth issue.

## B. *Star's Motion for Summary Judgment*

In the remainder of its fourth issue, Star asserts that the trial court erred in denying its motion for summary judgment on its fraudulent transfer claim with respect to NLW's transfer of the Property to DS 1415 and with respect to its claim that Choudhri, after executing the Settlement Agreement, fraudulently transferred the Fuqua Tract to Inner Belt. *See* TEX. R. CIV. P. 166a(c). Appellees argue that this issue is waived because Star did not obtain a ruling on its motion.

Generally, if a trial court's ruling granting one summary judgment motion necessarily denies another pending motion for summary judgment *on the same issue*, we will imply the ruling of denial, even if the trial court does not expressly rule on the latter motion. *See Frank's Int'l, Inc. v. Smith Int'l, Inc.*, 249 S.W.3d 557, 559 n.2 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Here, however, the parties did not seek summary judgment on the same issues. *See Coreslab Structures (Tex.), Inc. v. Scottsdale Ins. Co.*, 496 S.W.3d 884, 891 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *Frontier Logistics, L.P. v. Nat'l Prop. Holdings, L.P.*, 417 S.W.3d 656, 664

57

(Tex. App.—Houston [14th Dist.] 2013, pet. denied) (concluding that appellate court may render judgment on cross-motion to extent that cross-movant sought summary judgment on same issue addressed in summary-judgment motion granted). With respect to Star's fraudulent transfer claim against NLW, appellees moved for summary judgment on their affirmative defense. The issue appellees presented, and upon which the trial court ruled, was whether Star's claim was extinguished by the statute of repose. Star seeks summary judgment on the merits of its fraudulent transfer claims. The trial court did not reach the merits of this issue. Further, the trial court, at the summary-judgment hearing, expressly did not reach Star's claim regarding the Fuqua Tract.

To preserve error for appeal, a party must obtain a ruling from the trial court. *See* TEX. R. APP. P. 33.1(a); *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007) ("Preservation of error generally depends on whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.") (internal quotations omitted). Because Star did not obtain a ruling from the trial court on its motion for summary judgment, this issue is waived.

Accordingly, we overrule the remainder of Star's fourth issue.

## III. Res Judicata

In its third issue, Star argues that the trial court erred in granting appellees' motion for traditional summary judgment on Star's claim against appellees for

breach of the Settlement Agreement because appellees did not conclusively establish their affirmative defense of res judicata. *See* TEX. R. CIV. P. 166a(c). Star further asserts that the trial court erred by granting appellees more relief than they requested in their summary-judgment motion by dismissing all of Star's remaining claims against all appellees.

### *Standard of Review and Principles of Law*

Res judicata is an affirmative defense that may support a summary judgment if the movant conclusively proves all of the elements necessary to support the defense. *Fernandez v. Memorial Healthcare Sys., Inc*., 896 S.W.2d 227, 230 (Tex. App.—Houston [1st Dist.] 1995, writ denied); *see* TEX. R. CIV. P. 94 (identifying res judicata as affirmative defense). Res judicata precludes relitigation of claims that have been finally adjudicated, or that arise out of the same subject matter and that could have been litigated in the prior action. *Amstadt v. U.S. Brass Corp*., 919 S.W.2d 644, 652 (Tex. 1996). A party relying on res judicata must prove (1) a prior final determination on the merits by a court of competent jurisdiction, (2) identity of parties or those in privity with them, and (3) a second action based on the same claims as were or could have been raised in the first action. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

*Discussion*

Appellees, in their motion for summary judgment, argued that they were entitled to judgment against Star on its claim for breach of the parties' Settlement Agreement because Star's claim was barred by the doctrine of res judicata. To prevail on their motion for summary judgment on their affirmative defense, appellees were first required to conclusively establish "a prior final determination on the merits by a court of competent jurisdiction." *See id*.

Appellees asserted that Star's claim constituted a second action based on the same claim on which an *arbitrator* had previously made a final determination. Appellees attached, as their summary-judgment evidence, the Settlement Agreement; Levin's September 16, 2011 Final Non-Appealable Arbitrator's Order ("Order No. 1"); Levin's November 11, 2011 Arbitrator's Order No. 2 ("Order No. 2"); and Levin's August 7, 2012 Arbitrator's Confidential, Non-Appealable Order No. 6 ("Order No. 6").

Order No. 1 states that "on [May] 24, 2011, the parties . . . appeared before [Levin], Mediator, to *mediate* the above styled and numbered cause; and . . . the parties concluded the mediation with an executed [Settlement Agreement] (attached hereto . . .) by which, inter alia, the parties requested that the undersigned, [Levin], serve as *Arbitrator* herein." (Emphasis added.) Attached to the order was the Settlement Agreement.

The Settlement Agreement states, in relevant part, as follows:

1.    Land in Exhibit 1 [8.733 acres vacant land located on West Fuqua Street, Houston ("Fuqua Tract")] placed as collateral to a[n] $800,000 payment by [illegible] party to indemnify the payment [sic] if [Star] get[s] to final judgment after appeals are exhausted. [Star] may at its expense get another appraisal and **A. Levin will be non-appealable mediator** to decide that this tract and any additional tracts are more than 1 million dollars and fifty thousand.

. . . .

6.    If one or more disputes should arise with regard to the interpretation and/or performance of this agreement or any of its provisions, or the drafting or execution of further settlement documents, the parties agree to attempt to resolve any such dispute first by telephone conference with **Alan. F. Levin, mediator herein**, who facilitated this settlement. If the parties cannot resolve their differences by telephone conference, then each agrees to schedule one day of **mediation** with **Alan F. Levin, mediator herein**, within thirty (30) days after the unsuccessful telephone conference to attempt to resolve the disputes. The parties shall equally share the costs of such **mediation**. If any party refuses to mediate, then that party hereby forfeits all right to recover attorney's fees and/or costs in any **subsequent litigation** brought to construe or enforce this agreement. Conversely, if the subsequent mediation is unsuccessful, then the prevailing party or parties in the **subsequent litigation** shall be entitled to recover, as allowed by law or contract, reasonable attorneys' fees and expenses, including the cost of the unsuccessful mediation. Alan F. Levin has the final decision on any ambiguity in the settlement agreement.

(Emphasis added.)

Appellees asserted that, after Star complained that appellees had breached the Settlement Agreement because the Fuqua Tract did not appraise as represented, the parties then asked Levin, "acting as *arbitrator* under the provisions of the

61

[Settlement Agreement]," to determine the value of the collateral and whether appellees had complied with the Settlement Agreement. (Emphasis added.)

In Order No. 2, Levin concluded that appellees were to pledge additional collateral, as follows:

I. [Appellees] are to produce, on or before December 31, 2011, one of the following additional collateral options:

 a. Real property having a current "As-Is" appraisal value of not less than [$464,176.00]; or

 b. Cash or a bond in an amount not less than [$214,176.00].

II. [Counsel for Star] is to promptly contact the Arbitrator, following the November 14, 2011 hearing before the Court on this matter, to provide an update of [Star's] positions regarding the following issues:

 a. Return to mediation;

 b. Whether the Settlement Agreement has been breached with regard to the alleged tardy provision of additional collateral and whether [Star] chooses to waive or pursue same; and

 c. Dismissal by [Star] of [all appellees except Northpark] without prejudice.

It is so Ordered.

Appellees asserted that, on December 31, 2011, Star reasserted its claims against appellees and added a claim for breach of the Settlement Agreement, alleging that appellees had failed to timely pledge sufficient collateral as agreed and that Choudhri had transferred the Fuqua Tract to Inner Belt without placing equivalent value in escrow.

Eight months later, Levin, in Order No. 6, concluded that "the [Northpark] Defendants ha[d] complied" with both Order No. 2 and the Settlement Agreement, as follows:

> On the afternoon of Monday, August 6, 2012, . . . the Northpark Defendants hand delivered a check in the amount of [$43,796.00] to the Arbitrator in his law offices. . . . Based upon the foregoing, the Arbitrator FINDS that the Northpark Defendants have now fully complied with the collateral portion of Arbitrator's Order No. 2. The tardy completion of such compliance is excused.
>
> The Arbitrator also FINDS that the Northpark Defendants have now fully complied with the portion of the [Settlement Agreement] requiring that [$800,000.00] be placed as collateral "to indemnify the payment if the Plaintiffs get to final judgment after appeals are exhausted."
>
> It is, therefore, ORDERED that the Northpark Defendants have complied with both the Arbitrator's Order No. 2 and the Confidential Binding Settlement Agreement to the extent set forth above. . . .
>
> Based upon the foregoing, the Arbitrator, sitting also as the Mediator, sees no reason to declare an impasse in the mediation portion of the pending case and therefore, in light of the collateral requirement now having been fulfilled, invites the parties to consider the efficacy of further mediation toward amicable resolution of the entire pending dispute.

Appellees argued that Star's claim that they breached the Settlement Agreement was thus barred by res judicata because Order No. 6 constitutes "a final, non-appealable order from the arbitrator that directly refutes [Star's] claims of breach of the [Settlement Agreement]."

"[A]n award of arbitrators upon matters submitted to them is given the same effect as the judgment of a court of last resort." *CVN Grp., Inc. v. Delgado*, 95

S.W.3d 234, 238 (Tex. 2002); *see Universal Computer Sys., Inc. v. Dealer Sols., L.L.C.*, 183 S.W.3d 741, 752 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Thus, "[a]n arbitration award has preclusive effect for purposes of res judicata." *Premium Plastics Supply, Inc. v. Howell*, 537 S.W.3d 201, 204 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

Here, however, as Star complains on appeal, appellees' summary-judgment evidence does not reflect any agreement to arbitrate claims. "Whether a valid arbitration agreement exists is a legal question subject to de novo review." *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006). Arbitration cannot be ordered in the absence of an agreement to arbitrate, and thus, despite strong presumptions that favor arbitration, a valid agreement to arbitrate is a settled, threshold requirement. *Morgan v. Bronze Queen Mgt. Co., LLC*, 474 S.W.3d 701, 705 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

In interpreting the Settlement Agreement, we give common words their plain meaning. *Lesikar v. Moon*, 237 S.W.3d 361, 367 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). We consider the entire writing and attempt to harmonize and give effect to all the provisions by analyzing them with reference to the whole agreement. *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005). No single provision is given controlling effect. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). When, after the pertinent rules of

64

construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous, and we construe it as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 312. A disagreement between parties does not render a term ambiguous. *See DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999).

The text of the Settlement Agreement clearly states, as emphasized above, that Levin was authorized to act as a "mediator"; that the parties appeared before him, as "Mediator, to mediate the above styled and numbered cause"; and that the parties "concluded the mediation" by entering into the agreement. The Settlement Agreement further contemplates that, should "mediation" be unsuccessful, "subsequent litigation" might ensue. And, Levin "invite[d] the parties to consider the efficacy of further mediation toward amicable resolution of the entire pending dispute." Nothing in the Settlement Agreement suggests that the parties agreed to arbitrate their dispute or that Levin was to act as an arbitrator. Although the agreement reflects that the parties gave Levin "the final decision on any ambiguity in the . . . agreement," neither party identifies any ambiguity. That Levin identifies himself as an "arbitrator" in the "orders" subsequent to the Settlement Agreement is not controlling.

Further, although this Court has held that a mediator may also serve as an arbitrator in the same or a related dispute, it is only with the parties' express consent.

65

*See In re Provine*, 312 S.W.3d 824, 829 (Tex. App.—Houston [1st Dist.] 2009, orig. proceeding); *In re Cartwright*, 104 S.W.3d 706, 714 (Tex. App.—Houston [1st Dist.] 2003, orig. proceeding) (noting mediator should not act as arbitrator in same or related dispute without express consent of parties). The summary-judgment evidence does not include any such express consent.

Moreover, section 154.021(a) of the Civil Practice and Remedies Code authorizes a trial court to refer a pending dispute for resolution by an alternative dispute resolution procedure such as mediation. TEX. CIV. PRAC. & REM. CODE §§ 154.021(a), 154.023. When a matter is referred to mediation, the trial court does not lose jurisdiction over the case because a mediator does not have the power to render judgment; only the trial court has the authority to render a final judgment. *Id*. §§ 154.023(b) (providing that mediator may not impose own judgment on issues), 154.071(b) (providing that trial court may, at its discretion, incorporate terms of settlement agreement into court's final decree disposing of case). And, a mediated settlement agreement is enforceable *as a contract*. *Id*. § 154.071(a); *Hardman v. Dault*, 2 S.W.3d 378, 380 (Tex. App.—San Antonio 1999, no pet.).

In *Texas State Board of Dental Examiners v. Brown*, the court concluded that a mediated settlement conference that resulted in an agreed settlement order was "in the nature of a mediation [and] not a final adjudication." 281 S.W.3d 692, 708 (Tex. App.—Corpus Christi 2009, pet. denied). The court noted that the parties "arrived

at a settlement; the merits of the claim were not reached." *Id.* Thus, there was not a final judgment on the merits by a court of competent jurisdiction. *Id.* Because the defendant did not establish the element of a final adjudication, res judicata did not apply. *Id.*

We conclude that appellees did not conclusively establish "a prior final determination on the merits by a court of competent jurisdiction." *See Travelers Ins. Co.*, 315 S.W.3d at 862. Thus, the trial court erred by granting appellees summary judgment on their res judicata defense.

We sustain Star's third issue.

## Conclusion

We reverse the trial court's summary judgment granted in favor of appellees on the damages element of Star's breach-of-contract claim based on the ESA. We reverse the portion of the trial court's summary judgment dismissing Star's fraudulent transfer claim against NLW. Further, we reverse the trial court's summary judgment dismissing Star's remaining claims on the ground of res judicata. We remand these claims for further proceedings. We affirm the trial court's judgment in all other respects.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.